V. H. MONETTE AND COMPANY, INCORPORATED, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1305–63—1314–63. Filed October 11, 1965.

[1] Proceedings of the following petitioners are consolidated herewith: V. H. Monette East Coast Export Corporation, docket No. 1306–63; V. H. Monette East Coast Domestic Corporation, docket No. 1307–63; V. H. Monette West Coast Export Corporation, docket No. 1308–63; V. H. Monette West Coast Domestic Corporation, docket No. 1309–63; V. H. Monette Southern Corporation, docket No. 1310–63; V. H. Monette Southern Corporation, docket No. 1311–63; Supreme Products Corporation, docket No. 1312–63; Valmore H. Monette and Nannie B. Monette, docket No. 1313–63; and Valmore H. Monette, docket No. 1314–63.

*James R. Harper*, for the petitioners.
*Stuart E. Seigel* and *Francis O. McDermott*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax in amounts as follows:

| Docket No. | Petitioner | Taxable year ended— | | Deficiency |
|---|---|---|---|---|
| 1305-63 | V. H. Monette & Co., Inc | Oct. | 31, 1956 | $86, 822. 94 |
| | | Oct. | 31, 1957 | 53, 917. 80 |
| | | Oct. | 31, 1958 | 123, 819. 11 |
| | | Oct. | 31, 1959 | 69, 178. 60 |
| 1306-63 | V. H. Monette East Coast Export Corp | Oct. | 31, 1957 | 7, 068. 82 |
| | | Oct. | 31, 1958 | 20, 024. 18 |
| | | Oct. | 31, 1959 | 7, 908. 96 |
| 1307-63 | V. H. Monette East Coast Domestic Corp | Oct. | 31, 1957 | 62. 12 |
| | | Oct. | 31, 1958 | 7, 065. 59 |
| | | Oct. | 31, 1959 | 4, 586. 64 |
| 1308-63 | V. H. Monette West Coast Export Corp | Oct. | 31, 1957 | 1, 956. 64 |
| | | Oct. | 31, 1958 | 9, 764. 48 |
| | | Oct. | 31, 1959 | 4, 462. 17 |
| 1309-63 | V. H. Monette West Coast Domestic Corp | Oct. | 31, 1957 | 5, 143. 83 |
| | | Oct. | 31, 1958 | 11, 015. 53 |
| | | Oct. | 31, 1959 | 2, 059. 97 |
| 1310-63 | V. H. Monette Southern Corp | Oct. | 31, 1957 | 2, 628. 52 |
| | | Oct. | 31, 1958 | 35, 500. 69 |
| 1311-63 | V. H. Monette Southern Corp | Oct. | 31, 1959 | 19, 922. 23 |
| 1312-63 | Supreme Products Corp | Aug. | 31, 1957 | 23, 760. 36 |
| | | Aug. | 31, 1958 | 24, 187. 99 |
| | | Aug. | 31, 1959 | 25, 879. 22 |
| 1313-63 | Valmore H. Monette and Nannie B. Monette | Dec. | 31, 1955 | 61, 204. 45 |
| | | Dec. | 31, 1957 | 59, 410. 86 |
| | | Dec. | 31, 1958 | 64, 732. 13 |
| | | Dec. | 31, 1959 | 25, 354. 06 |
| 1314-63 | Valmore H. Monette | Dec. | 31, 1956 | 107, 190. 79 |

By amendments to the petitions filed in docket Nos. 1306–63, and 1308–63 to 1313–63, inclusive, overpayments have been claimed, dependent upon the determination by this Court of issue 1, *infra.* The amounts of such contingent overpayments are not in dispute.

Petitioners concede that certain adjustments to commissions in the aggregate amounts of $86,466.19 for the taxable year ended October

31, 1958, and $19,992.82 for the taxable year ended October 31, 1959, were properly determined by the respondent. It is stipulated and agreed that the useful life for depreciation purposes of the office building and warehouse in Smithfield, Va., recorded on the books of V. H. Monette East Coast Export Corp., is 25 years. Effect will be given to this concession and stipulation under Rule 50.

The remaining issues for decision are:

(1) Whether the existence of V. H. Monette East Coast Export Corp., V. H. Monette East Coast Domestic Corp., V. H. Monette West Coast Export Corp., V. H. Monette West Coast Domestic Corp., V. H. Monette Southern Corp., sometimes collectively referred to herein as the Monette companies, and Supreme Products Corp., sometimes referred to herein as Supreme, are shams and are to be disregarded and their combined net income imputed to V. H. Monette & Co., Inc., sometimes referred to herein as Incorporated, pursuant to section 61 of the Code,[2] or whether, in the alternative, such combined net income of the Monette companies and Supreme should properly be allocated to Incorporated pursuant to the provisions of section 482 of the Code;

(2) Whether, in the event this Court determines issue 1 adversely to respondent, the surtax exemptions of the Monette companies and Supreme should be disallowed pursuant to section 269 of the Code;

(3) Whether net withdrawals made by Valmore H. Monette, sometimes referred to herein as Monette, from corporations controlled by him and payments made by such corporations on his behalf and for his benefit constitute constructive dividends to him;

(4) Whether losses sustained in the operation of the Smithfield Farm property are deductible as having been incurred in a trade or business;

(5) Whether amounts paid to an employee (Fenton Albright) of a manufacturer (Stokely-Van Camp, Inc.) are deductible as ordinary and necessary business expenses;

(6) Whether aggregate deductions for compensation of Monette claimed by his controlled corporations herein were unreasonable and excessive in amount;

(7) Whether the assessment and collection of deficiencies determined by the respondent against the individual petitioners for the taxable years 1955 and 1956 are barred by the statute of limitations;

(8) Whether a joint return was filed by Monette and Nannie B. Monette, his wife, for the taxable year 1956;

(9) Whether, if it is determined that the income and the expenses of Supreme are properly attributable to Incorporated, an increase in income determined by the respondent to be properly attributable to

---

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Incorporated may be excluded from the computation of its income by virtue of the fact that a deficiency in income tax was previously paid by Supreme with respect to the same items;

(10) Whether more than one inspection of either or both of the individual petitioners' books and records was made by the respondent for their taxable years 1955 and 1956;

(11) Whether deductions claimed by one of the Monette companies (V. H. Monette East Coast Export Corp.) for depreciation of a boat, boathouse, and boat cradle are allowable;

(12) Whether commission income reported by Supreme in the amount of $2,612.98 for the period November 1, 1955, through August 31, 1956, is includable in the income of Incorporated for its taxable year ended October 31, 1956;

(13) Whether deductions claimed by the individual petitioners for entertainment expenses for 1958 and 1959 were excessive in the amounts of $3,575 and $1,150, respectively;

(14) Whether, if issue 1 is decided for the respondent, the loss carryover of Southern for the fiscal year 1954 is a proper carryover to 1956; and

(15) Whether, under any circumstances, the respondent can add the income of the Monette companies and Supreme for fiscal 1956 to that of Incorporated for fiscal 1956 since the statute of limitations as to the Monette companies and Supreme for 1956 has expired but has not expired as to Incorporated for 1956.

Issues 11, 12, and 13 are considered as abandoned since they are not discussed in petitioners' briefs.

GENERAL FINDINGS OF FACT

The stipulated facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Monette and Nannie B. Monette, sometimes referred to herein as Nannie, are husband and wife and reside in Smithfield, Va. They filed joint Federal income tax returns for the calendar years 1955, 1957, 1958, and 1959 with the district director of internal revenue, Richmond, Va. A 1956 income tax return [3] in the names of "Valmore H. and Nannie B. Monette" was also filed with the said district director.

Supreme was chartered as a corporation on August 9, 1951, under the laws of the State of Virginia. Its Federal income tax returns for the taxable years ended August 31, 1956, 1957, 1958, and 1959, were filed with the district director of internal revenue, Richmond, Va.

Incorporated was chartered as a corporation on April 6, 1953, under the laws of the State of Virginia. It filed Federal income tax returns

---

[3] Whether this return was or was not a "joint" return is the subject of issue 8.

for the taxable years ended October 31, 1956, 1957, 1958, and 1959, with the district director of internal revenue, Richmond, Va.

V. H. Monette East Coast Export Corp., sometimes referred to herein as East Export, V. H. Monette East Coast Domestic Corp., sometimes referred to herein as East Domestic, V. H. Monette West Coast Export Corp., sometimes referred to herein as West Export, V. H. Monette West Coast Domestic Corp., sometimes referred to herein as West Domestic, and V. H. Monette Southern Corp., sometimes referred to herein as Southern, were all chartered as corporations on October 27, 1953, under the laws of the State of Virginia. The Monette companies filed Federal income tax returns for the taxable years ended October 31, 1956, 1957, and 1958, with the district director of internal revenue, Richmond, Va. With the exception of Southern, they also filed Federal income tax returns for the taxable year ended October 31, 1959, with the said director. Southern and another corporation called the Impala Corp. filed a consolidated Federal income tax return for the taxable year ended October 31, 1959, with the said district director.

Incorporated, the Monette companies, and Supreme filed their Federal income tax returns for the taxable periods involved on the accrual method of accounting. The income tax returns filed by Monette and Nannie for their taxable periods involved herein were filed on the cash method of accounting.

The examination of the income tax liabilities of the petitioners which resulted in the deficiencies herein commenced on June 9, 1959.

*Issues 1 and 2*

FINDINGS OF FACT

Commencing about 1937 Monette became engaged as a manufacturer's representative to the military in the Norfolk, Va., area, and operated as a sole proprietor under the trade name of "V. H. Monette and Company."

The petitioner corporations sell only products that are bought by the military for authorized resale in commissary stores and are not involved in purchases relating to troop feeding or subsistence. Monette usually dealt only with brand name suppliers.

Payments for purchases made by the commissaries for such resale articles are made directly to the contracting manufacturer and not to the contractor's sales agent or representative.

The Armed Services Procurement Act of 1947 provides, in part, that purchases by military agencies of property for authorized resale are authorized to be purchased by means of negotiation without the necessity of formal advertising. Pursuant thereto, items for resale

in military commissary stores are ordered and purchased by the individual military installation or commissary store.

The Defense Subsistence Supply Center and its predecessor organizations, sometimes referred to herein as DSSC, is the central governmental agency, located in Chicago, Ill., empowered to enter into certain contracts on behalf of the Government to deliver brand name items at fixed prices to specified installations. The agreement between the supplying manufacturer or contractor and the Government is referred to as a purchase notice agreement or brand name contract.

The manufacturer or contractor who enters into a brand name contract may employ other persons or firms to solicit orders for the purchase of the product being sold.

Under applicable regulations, the brand name supplier must make a declaration to DSSC as to whether or not he employs anyone other than his own personnel to solicit orders under the contract.

If the brand name supplier utilizes the service of persons other than his own employees to receive orders, he is required to execute a standard Form 119, entitled "Contractor's Statement of Contingent or Other Fees," which form identifies the sales agent or representative and sets forth their agreement.

The delivered prices of a brand name product will vary from area to area only by reason of the difference in freight costs. Each brand name supplier establishes, in accordance with his own particular commercial practice, delivery zones. Prices have usually been set on a zone basis. Commissary stores of the Department of Defense (including Army, Air Force, Navy, and Marine Corps) located in the United States, have been broken down under six zones of delivery (areas of distribution), each zone incorporating a certain number of States.

Until 1947 Monette had only two salesmen besides himself. They were his brother Ike Monette and Lester M. Covey. In 1947 Monette started to operate in the commissary and exchange business. By 1952 there were over 200 commissaries in the United States and there were 51 additional commissaries in the United States added after 1953. In 1955 the Armed Forces had 210 commissary stores in the United States with 438,770 individual accounts and about 1,316,310 consumers. The Armed Forces also had 189 commissaries overseas with 96,172 individual accounts and about 288,516 individual consumers. In addition to the individual accounts of active service personnel, there were 172,314 retired personnel who, with their immediate families, had access to the various military commissary stores.

During the years in question, all food products purchased by brand name to meet customer demand at overseas Army and Air Force commissary stores were procured by military purchasing offices located

in the continental United States and were shipped from U.S. ports of embarkation. There were 118 individual commissaries in the trade area served by East Export that stocked 1,300 line items.

Supreme was the first of the corporations here involved to be incorporated. Stokely-Van Camp, Inc., sometimes referred to herein as Stokely, is a food-processing company. In approximately 1946 Stokely commenced supplying various commissaries and other military installations with its products and at about that time engaged Monette as its military sales representative.

Fenton Albright, sometimes referred to herein as Albright, had become an employee of Stokely in 1946. Albright was responsible for Stokely's engaging Monette as its military sales representative. Shortly after Monette was so engaged, Monette found that Stokely was not giving him credit for the Army and Air Force exchange business from overseas bases, which was quite substantial. In 1951 Monette decided to set up a separate corporation, Supreme, to handle the Stokely account. Subsequent to Supreme's incorporation, Monette continued to operate as a sole proprietor and during that period the salesmen employed by him were used to sell Stokely products. Thereafter, Incorporated and the Monette companies were organized and their salesmen continued to sell the Stokely products. Supreme, through Monette as its president, engaged Albright to work directly with the salesmen selling the Stokely products. The Stokely products were the most important product group from a standpoint of dollar volume. The annual sales of Stokely products by Incorporated and the Monette companies exceeded $6,500,000 each year.

At all times material to this proceeding, Supreme had no employees other than its company officers and Albright. Albright was employed as a consultant of Supreme and was employed upon an incentive basis of compensation. He actually worked with the salesmen of Incorporated and the Monette companies to increase sales to commissaries and for these services Supreme paid Albright substantial amounts which Supreme claimed as deductions from its gross income on its returns for the years 1956 through 1959.[4] Prior to the formation of Incorporated and the Monette companies, Monette paid Supreme 15 percent of the gross commissions received from Stokely and Supreme paid Albright as compensation an amount computed at 10 percent of the said gross commissions which was later reduced to approximately 7 percent. After the formation of Incorporated and the Monette companies, these corporations paid Supreme 30 percent of the gross commissions received from Stokely and Supreme paid Albright the said approximately 7 percent. The only *officer* of Supreme who re-

---

[4] See our findings of fact re issue 5, *infra.*

ceived a salary was Monette. During the fiscal year ending August 31, 1956, Monette was paid a salary of $7,000 and for the next 3 years a salary of $25,000 per annum.

On August 31, 1951, or about 22 days after incorporation, Supreme issued 40 shares of class A capital stock to Monette, 20 shares of class A stock to Albright, 66 shares of preferred stock to Monette, and 34 shares of preferred stock to Albright. Such stock was issued to Albright without the payment by him of any consideration therefor. On July 10, 1953, the certificates of stock in Supreme, representing the 20 shares of class A stock and 34 shares of preferred stock held in the name of Albright, were canceled. On the same date 20 shares of class A and 34 shares of preferred stock of Supreme were issued to Monette.

On its returns for the fiscal years ending August 31, 1956, through August 31, 1959, Supreme reported commission income, deductions, and net income as follows:

| Fiscal year | Commissions | Deductions | Net income |
|---|---|---|---|
| 1956 | $42,913.12 | $22,491.73 | $20,421.39 |
| 1957 | 59,002.08 | 46,943.88 | 12,058.20 |
| 1958 | 68,064.03 | 44,171.78 | 23,892.25 |
| 1959 | 75,970.15 | 45,736.79 | 30,233.36 |

Among the deductions, other than compensation to Monette and Albright, were certain amounts for such items as State income taxes, registration and franchise fees, brokers license, interest, State unemployment taxes, freight, samples and advertising, and contributions.

Supreme had its principal office in the home office at Norfolk and at Smithfield after the home office was moved to Smithfield. Supreme never paid or declared any formal dividends.

The business of Incorporated, the Monette companies, and Supreme was always conducted under the trade name of "V. H. Monette and Company."

Incorporated was the second of the corporations here involved to be incorporated. As Monette's business grew, he was advised by an attorney that such incorporation would serve to perpetuate the business in the event of his death. Incorporated did not begin doing business until November 1, 1953, which was after the incorporation of the Monette companies on October 27, 1953.

Incorporated, in addition to its activities of sales to commissaries and post exchanges, maintained a warehouse and actually warehoused and sold merchandise to ships of the Navy. It also maintained delivery facilities and it was necessary to maintain a 24-hour delivery capability. No other corporation in this group was engaged in ware-

housing or merchandising of goods to the Armed Forces. Incorporated realized warehousing income in the fiscal years 1957, 1958, and 1959 in the amounts of $3,560.60, $6,217.48, and $6,641.37, respectively.

The certificates of incorporation of Incorporated and the Monette companies were substantially identical as to the enumeration of corporate powers. They also provided that the principal office of each corporation was to be located in Norfolk, Va. The incorporators of Incorporated and the Monette companies were Monette, P. D. Harrison, and B. L. Kinne, who were designated in the respective certificates of incorporation as the sole directors of the Monette companies, as the majority of the directors of Incorporated, and as president, secretary, and treasurer of the Monette companies and Incorporated.

Incorporated and the Monette companies were intended to conduct business in the following geographical areas which correspond substantially with the six zones of delivery previously mentioned herein:

Incorporated_____ Southern Virginia.
East Domestic_____ The New England States, New York, New Jersey, Pennsylvania, Delaware, Maryland, District of Columbia, and Northern Virginia.
West Domestic_____ Montana, Washington, Oregon, California, Nevada, and Arizona with the exception of 2 commissaries in Tucson.
Southern_____ The rest of the continental United States comprising 30 States, a part of Idaho, and 2 commissaries in Tucson, Ariz.
East Export_____ Europe.
West Export_____ Pacific and the Far East.

The various corporations, as established to embrace separate trade areas, had distinctly unequal earning prospects. This unequal division of income and income prospects posed the serious tax risk that some corporations might realize losses which would not be offset against income of other corporations, as under the law they could not file a consolidated return.

When the Monette companies were organized and for a period continuing thereafter until 1957, each corporation paid its own direct expenses. These expenses were those directly attributable to the individual corporation such as salaries, office expenses, rent, etc. This constituted about 80 or 90 percent of the expenses of the individual corporations.

At the time these corporations were formed, it was intended that each of the corporations was to be under the general supervision of Monette and he was to be its chief executive officer. In forming the corporations Monette was not primarily motivated by tax considerations.

On November 2, 1953, the following corporations issued common stock to Monette for the consideration indicated:

| Corporation | Number of shares | Consideration | | Total consideration |
| --- | --- | --- | --- | --- |
| | | Cash | Furniture, etc. | |
| Incorporated | 400 | $150.60 | $6,349.40 | $6,500 |
| East Domestic | 100 | 1,163.26 | 836.74 | 2,000 |
| West Domestic | 100 | 1,576.33 | 423.67 | 2,000 |
| West Export | 100 | 2,552.67 | 447.33 | 3,000 |
| East Export | 100 | 2,501.90 | 2,498.10 | 5,000 |
| Southern | 100 | 1,063.42 | 1,936.58 | 3,000 |
| | | 9,008.18 | 12,491.82 | 21,500 |

None of the corporations here involved was created by a transfer of property from any other corporation.

Until the close of the taxable years in question, Monette owned 100 percent of the voting stock of Incorporated and the Monette companies. Thereafter, some of the corporations issued some stock to certain employees.

Incorporated and the Monette companies had their own employees, including sales personnel. In some instances an employee would perform services for more than one corporation, in which case his compensation would be allocated between the two corporations.

On November 2, 1953, Incorporated and the Monette companies entered into a written agreement, the material provisions of which are as follows:

THIS AGREEMENT, Made this 2nd day of November, 1953, by and between [Incorporated], * * * party of the first part, [Southern, East Domestic, West Domestic, East Export, and West Export], * * * parties of the second, third, fourth, fifth and sixth parts, respectively, to-wit:

WHEREAS, V. H. Monette has heretofore engaged in business as a manufacturers' agent * * * doing such business as a proprietorship under the trade name of "V. H. Monette & Co.", and in and about such business has maintained a domestic and foreign sales promotional organization, with general offices in the City of Norfolk, Virginia, through which general offices all orders obtained directly for the purchase of such products were reported and cleared, * * * and to which offices said manufacturers also made regular remittances covering all sales commissions due for the sale of such products, * * * and

WHEREAS, said V. H. Monette also employed certain salesmen to handle the sales and promotion of said products on a territorial basis, * * * and

WHEREAS, said manufacturers and processors desire to continue their practice of making only one report and remittance covering all commissions on all sales to all such agencies of the United States government, without regard to the origin, or proper allocation of such sales, and neither of the parties hereto desire to jeopardize the existing arrangements with said manufacturers or processors; and

WHEREAS, Mr. Monette and the members of his organization believe that the exclusive representation of said manufacturers and processors will be terminated

in the event of the death of the said V. H. Monette, if such business be then carried on as a proprietorship, and that his sales organization will thereupon disintegrate; and the members of said organization desire to promote the continuity of such exclusive representation and of the organization, *the said V. H. Monette has decided to decentralize his business by the establishment of new and separate "Monette" corporations and the transfer of his business thereto, one of which corporations, (being the herein party of the first part), will maintain the general offices above mentioned, and will continue to do business under the trade name of "V. H. Monette & Co.", and others of which will maintain the foreign sales promotional organization aforesaid, and/or will represent said manufacturers, etc., on a territorial basis (which may from time to time be changed)*, or in certain instances, handle the products of only certain manufacturers, * * * and

WHEREAS, the party of the first part [Incorporated] will accordingly advance the expenses for and maintain the general offices aforesaid, which expenses constitute the general overhead expenses necessary to maintain such exclusive agencies, and said party will also continue to receive all reports and remittances from said manufacturers and processors; and

WHEREAS, the parties hereto desire that the [Monette companies] * * * shall re-pay to the party of the first part their just and fair proportion of such general overhead expenses, in addition to their own direct expenses, and the parties are agreed that at present such fair proportion of said general overhead expenses should be computed on a percentage basis, being the proportion of the gross sales commissions earned by each of the parties of the second, third, fourth, fifth and sixth parts [the Monette companies] to the total gross sales commissions earned by all six of the parties hereto, which percentages can only be estimated at this time however, by considering the previous volume of commissions earned by said V. H. Monette in gross, and on a territorial basis, and which percentages are currently estimated at 15% for the party of the second part; at 10% for the party of the third part; at 5% for the party of the fourth part; at 30% for the party of the fifth part; and at 20% for the party of the sixth part;

NOW THEREFORE, THIS AGREEMENT WITNESSETH, that the parties hereto do agree:

1. That [Incorporated] * * * will continue to maintain such general offices in Norfolk, and to advance and pay the expenses thereof, as general overhead expenses, and

2. That [Incorporated] * * * will keep full and accurate accounts of all merchandise sold by said manufacturers in the territories handled by the parties of the second, third, fourth, fifth and sixth parts, as reported by said parties and/or said manufacturers, or claimed by such parties, and that it will render regular reports to said parties of all sales commissions earned by them, and will further receive and collect from said manufacturers the amounts of said sales commissions, and will from time to time remit the same to the parties of the second, third, fourth, fifth and sixth parts in accordance with said accounts, and

3. That the parties of the second, third, fourth, fifth and sixth parts shall likewise regularly pay to [Incorporated] * * * either directly, or by cross charge against such sums as may be due, a sum equal to their respective above specified percentages of the total of such general overhead expenses.

And the parties hereto do further agree that, within four months from the end of the fiscal year of [Incorporated], * * * said party shall compute the

total volume of sales commissions earned by all six such "Monette" corporations, and the total amount of such commissions earned by each of the parties hereto, and will compute the actual percentage of the commissions earned by each of said parties to the total of said sales commissions, and that the parties will respectively pay to one another, as the case may be, any difference between said above specified percentages of such total general overhead expenses, and the actual percentage thereof.

The parties further agree that this contract shall continue in full force and effect * * * unless amended by consent or unless either party hereto shall give to the other written notice of its desire to terminate the same.

[Emphasis supplied.]

On November 2, 1953, Incorporated, as first party, also entered into a contract with Supreme, as second party, which contract was similar to the contract with the Monette companies except for the following paragraphs:

WHEREAS, the party of the first part will employ certain salesmen * * * through the activities of which salesmen and which office said party expects, in the territory handled by such salesmen and office, to directly and indirectly obtain orders from said government agencies for the purchase of many of the products of the Stokely-VanCamp Company; and

WHEREAS, said Stokely-VanCamp Company will also continue to report and pay to the party of the first part all of the commissions on all sales made to such agencies of the United States government by the several "Monette" corporations handling such sales on a territorial basis, without regard to or the burden of determining which of said corporations originated such sales, and the parties hereto believe that said Stokely-VanCamp Company desires to continue its practice of making reports of sales and of remittances solely to V. H. Monette & Co.; and

WHEREAS, it is necessary, because of an agreement between the party of the second part and its sales consultant, that the party of the first part shall pay over to or credit the party of the second part with all of the commissions received by the party of the first part from said Stokely-VanCamp Company; and

WHEREAS, the parties hereto desire that the party of the first part shall be reimbursed for the expenses which it will incur in and about the procurement of sales of the products of said Stokely-VanCamp Company in the territory handled by it, and the parties have agreed that a fair tentative apportionment of such expenses is a sum equal to 70% of the gross commissions earned by Supreme on sales of the products of the Stokely-VanCamp Company originated by the party of the first part;

Now THEREFORE, the parties hereto do hereby agree that said party of the first part shall receive and collect from said Stokely-VanCamp Company the entire commissions payable by said company on all sales of its products to all such agencies, whether made by the party of the first part, or by such other "Monette" corporations, which commissions the party of the first part shall from time to time pay over to the party of the second part, either directly, or by entry on its books:

AND the party of the second part agrees that the party of the first part shall be entitled to 70% of the commissions earned by Supreme on such sales of the products of said Stokely-VanCamp Company as are originated by the first party

as reimbursement for its share of said expenses, which amount shall, from time to time, be paid by the party of the second part to the party of the first part, either directly, or by cross entry on the books of said companies.

Also, on November 2, 1953, special meetings of the board of directors of Incorporated and Supreme were held to authorize and put into effect the provisions of the above contracts entered into on the same day between Incorporated and the Monette companies, and Supreme. Among other things, the minutes of the Incorporated meeting, which are quite extensive (13 pages), recorded that Monette was convinced "that, in short, his business had become too much a one-man proposition, and the volume thereof had increased to such an extent that he no longer had proper control over it" and "Further, in order to encourage his various key employees, and to permit continuity of his business in the event of his death, his accountants had advised that the total volume of his business should be broken down and assigned to various separate corporations, some of which would be created on a strictly territorial basis, and some of which, for peculiar reasons, would be created to handle the business of only certain manufacturers, and each of which corporations would be put primarily under the management and control of the individual employees most familiar therewith."

Employees of the individual corporations were advised that there were six corporations organized upon the basis of geographical locations.

Business immediately expanded after the formation of Incorporated and the Monette companies. Between 1955 and 1959 employees of Incorporated and the Monette companies increased from a total of 13 to 37.

The increase in commissions varied from corporation to corporation for the years 1954 to 1959 as follows:

| Corporation | Commission income reported | | Percentage of increase 1954–59 |
|---|---|---|---|
| | Fiscal year 1954 | Fiscal year 1959 | |
| Incorporated | $36,376.53 | $59,282.14 | 62.9 |
| East Domestic | 50,398.32 | 170,310.29 | 237.9 |
| East Export | 105,071.55 | 278,516.39 | 165.0 |
| West Domestic | 54,054.02 | 161,547.13 | 198.8 |
| West Export | 76,321.94 | 179,073.46 | 134.6 |
| Southern | 79,961.53 | 421,287.16 | 426.8 |
| Supreme | 23,006.53 | 75,970.15 | 230.2 |

Salesmen of the several corporations generally received one-half of the total commissions paid the several corporations by the manufacturers.

Orders were received from the individual military commissaries and mailed to regional offices for each individual corporation. There the orders would be checked for proper prices and terms, and orders were forwarded directly to the shipping point or billing point of the manufacturers. In some instances the orders were sent directly to the manufacturers and in others to public or bonded warehouses designated by manufacturers, but no orders were sent to Smithfield or Norfolk for action except, of course, the orders pertaining to Incorporated. After the orders were forwarded directly to the manufacturers, the local office of each corporation followed up to make sure shipments arrived on time and in good order. Local offices handled losses or damage claims and Smithfield or Norfolk were not involved in processing the orders except, of course, the orders pertaining to Incorporated.

After Incorporated and the Monette companies were formed business continued to be transacted under the trade name of "V. H. Monette and Company." Telephone listings and letterheads were in the trade name. The identity of the individual corporations, however, was clearly set out on financial statements filed with the National Bank of Commerce in Norfolk and in credit reports filed with Dun & Bradstreet.

The books and records of all of the corporations were maintained at the home office in Norfolk and, subsequent to January 1957, in Smithfield, the place to which the home office was moved. No bank accounts were ever maintained in the names of the various corporations in the locale of any of the branch offices. Invoices for purchases made at the branch offices of equipment and supplies, other than petty cash expenditures, were sent to the home office for payment.

Leases for office space at the various branch locations were generally executed in the name of "V. H. Monette & Company," "V. H. Monette & Co.," or "V. H. Monette Company." No lease was executed in the name of any of the five Monette companies, as such. The nearest to such an execution were two leases in San Antonio, Tex., which were executed in the name of "V. H. Monette & Company Southern Corporation" and "V. H. Monette & Co. Southern Corporation," respectively.

Commission checks from suppliers or manufacturers were generally made payable to "V. H. Monette and Company" and were never directed to be made payable to or in fact made payable to Incorporated, the Monette companies, or Supreme. Such checks were always mailed to the home office and not to the branch offices.

In 1953 separate accounts in the names of Incorporated, the Monette companies, and Supreme were opened in the National Bank of Commerce, Norfolk, Va. (now the Virginia National Bank), and on De-

cember 8, 1953, an account in said bank was opened entitled "V. H. Monette and Company Clearing Account," sometimes referred to herein as the clearing account. In March and April 1957 the separate accounts of Incorporated, the Monette companies, and Supreme were closed. Thereafter, the only bank account maintained by or for any of the petitioners, with the exception of Monette, was the clearing account which is still active.

During the years 1956 to 1959, inclusive, State unemployment tax returns were filed by each of the corporate petitioners in their respective corporate names.

On their Federal income tax returns for the taxable periods here involved, Incorporated, the Monette companies, and Supreme all reflected as their respective addresses the address of the home office in Norfolk or Smithfield, Va.

During the period from approximately 1953 to 1957 when separate bank accounts were maintained at the bank in the names of the various corporations, commission checks received from manufacturers were deposited to one account, the clearing account. A cash receipts book entitled "Clearing" was maintained which reflected the receipt of the check. Thereafter, checks would be drawn on the clearing account in favor of the various corporations which distributed the commission income so received on the basis of an estimate. This estimate was predicated upon the prior year's ratio of commission income attributed to each corporation to the total commission income of all corporations. On the books of the various corporations, the receipt of the checks so drawn on the clearing account was reflected as debits to "cash" and credits to "commissions received."

At the end of the year a determination was made of the total commissions for the year attributable to each corporation on a geographical basis. To the extent these figures varied from the amounts distributed on the basis of the estimate, correcting journal entries were made.

During this period, direct expenses, such as rent, utilities, and branch office salaries, were paid by checks drawn at the home office on the separate bank accounts.

General administrative expenses and salaries, including the overhead of the home office, were handled and paid by Incorporated and reflected on its books. At the end of the year, these expenses were allocated among the various corporations on the basis of the ratio of commissions attributed to each to the total commissions received.

After the separate bank accounts were closed in 1957 all commission checks were deposited in the clearing account. Commission income of each of the corporations was entered on the books of the individual

corporations at the end of the year when a single journal entry was made debiting "cash" and crediting "commission income."

After the separate corporation bank accounts were closed, all expenses were paid by checks drawn out of a single checkbook on the V. H. Monette & Co. clearing account. On the check stub for each check drawn in payment of "direct expenses" a notation was made of the corporation to be charged therefor. These expenditures were posted currently to the separate corporation books, and each check for direct expense was posted into each corporation's cashbook. The remaining "administrative" or "overhead" expenses were allocated among the various corporations by virtue of yearend journal entries on the basis of the ratio of commission income attributed to each corporation to total commissions received.

Supreme did not claim deductions in its Federal tax returns for prorated home office expenses as the Monette companies did.

The building housing the home office and the land on which it is located in Smithfield, Va., is owned by East Export. A monthly rental of $1,000 is allocated among the other corporations. During the fiscal years 1957, 1958, and 1959, East Export realized rental income from other corporations of $7,178, $12,000, and $12,000, respectively. The land was purchased from Monette and Nannie for an agreed consideration of $10,000 but no cash payment was made to the Monettes as the entire amount was applied on Monette's loan from East Export. The agreed purchase price of $10,000 was reported as a capital gain in the amount of $9,500 on Monette and Nannie's joint individual income tax return for 1956.

A substantial portion of the gross income reported by Incorporated on its Federal income tax returns resulted from reimbursement by the other corporations of the "overhead" expenses. The following table reflects the classes and amounts of gross income reported on Incorporated's returns for the indicated taxable periods:

| TYE Oct. 31— | Expense reimbursement | Commissions | Miscellaneous | Total |
|---|---|---|---|---|
| 1955 | $150,666 | $29,331 | $1,398 | $181,395 |
| 1956 | 169,258 | 39,912 | 0 | 209,170 |
| 1957 | 246,853 | 66,402 | 3,560 | 316,815 |
| 1958 | 266,118 | 52,325 | 6,221 | 324,664 |
| 1959 | 403,845 | 59,282 | 8,924 | 472,051 |
| Total | 1,236,740 | 247,252 | 20,103 | 1,504,095 |

ULTIMATE FACTS

Incorporated, the Monette companies, and Supreme were separate, distinct, viable legal entities engaged in business activity during the years 1956 to 1959, inclusive. The net income reported by the Monette

companies and Supreme was earned by them and is not taxable to Incorporated under either section 61 or 482 of the 1954 Code. Each of these corporations is entitled to a separate surtax exemption of $25,000 under section 11(c) of the 1954 Code for each of the years 1956 to 1959, inclusive, because none of these corporations was formed with the principal purpose of obtaining any tax benefit or deduction.

OPINION RE ISSUES 1 AND 2

Respondent concedes that Incorporated is a valid corporation but contends that the Monette companies and Supreme are shams and should be disregarded and their combined net income imputed to Incorporated under section 61,[5] or, in the alternative, the gross income, deductions, credits, or allowances of the Monette companies and Supreme should be allocated to Incorporated under section 482,[6] or, in any event, the surtax exemption provided for under section 11(b)[7] should be denied the Monette companies and Supreme by reason of section 269.[8]

Monette had built up over a score or more of years a large, profitable business which he operated as a sole proprietor under the trade name of "V. H. Monette and Company." He was carrying on a

---

[5] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

[6] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

[7] SEC. 11. TAX IMPOSED.

(b) NORMAL TAX.—

\*       \*       \*       \*       \*       \*       \*

(c) SURTAX.—The surtax is equal to 22 percent of the amount by which the taxable income \* \* \* exceeds $25,000.

[8] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

(2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

legitimate business over most of the civilized world. His business kept growing larger and Monette became very much concerned as to what would happen to it in the event of his demise. He took a natural course and sought competent legal advice. The result was the formal creation of Supreme, Incorporated, and the five Monette companies, all separate legal entities organized under the laws of the Commonwealth of Virginia. The idea was to decentralize his sole proprietorship business substantially along the line of the six zones of delivery that were being used more or less as a guide by the manufacturers who were selling to the commissaries. The idea perhaps can be pointedly illustrated by an excerpt [9] from the minutes of a special meeting of the board of directors of Incorporated held on November 2, 1953.

The corporations so formed were separate, legal entities, conducting their own business, with offices and employees and their own books and records, and as such should ordinarily not be ignored or disregarded. "The tax laws make substantial differences between individuals and corporations, and in tax matters the tendency is not to ignore the corporate entity unless it be used to defraud the law, but rather, when natural persons are using corporate forms to do their business, they and their corporations are held to the literal consequences." *Bancker* v. *Commissioner*, 76 F. 2d 1 (C.A. 5, 1935), affirming 31 B.T.A. 14, and citing four U.S. Supreme Court decisions. Much to the same effect is *Polak's Frutal Works, Inc.*, 21 T.C. 953, 973, wherein we said:

a taxpayer is free to choose the type of organization or form in which he will cast his business activities to achieve a desired business or tax result. *John Junker Spencer, supra; Higgins* v. *Smith*, 308 U.S. 473. He is not required to adopt or continue with that form of organization which results in the maximum tax upon business income. *Meldrum & Fewsmith, Inc.*, 20 T.C. 790. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436. Furthermore, if a taxpayer actually carries on business in the form chosen, the tax collector may not deprive him of the incidental tax benefits flowing therefrom, unless it first be found to be but a fiction or a sham. *John Junker Spencer, supra; Higgins* v. *Smith, supra; Rhode Island Hospital Trust Co.*, 7 T.C. 211. * * *

---

[9] "The President [Monette] stated that, in short, his business had become too much a one-man proposition, and the volume thereof had increased to such an extent that he no longer had proper control over it. Since the maintenance of such volume of business required that considerable confidence and authority be vested in those of his employees who were familiar with the various manufacturer's accounts, their sales policies, and the products handled, etc., it was necessary to break the business down into separate divisions. Further, in order to encourage his various key employees, and to permit continuity of the business in the event of his death, his accountants had advised that the total volume of his business should be broken down and assigned to various separate corporations, some of which would be created on a strictly territorial basis, and some of which, for peculiar reasons, would be created to handle the business of only certain manufacturers, and each of which corporations would be put primarily under the management and control of the individual employees most familiar therewith. It was also the thought of the accountants that the success of the separate corporations would be further promoted by giving the key employees in each a portion of the stock ownership therein, and by the establishment of retirement funds and other employee incentive features. * * *"

In *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422, the Supreme Court said that the Court of Appeals for the Second Circuit correctly held—

that under our decisions, when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can made no difference tax-wise. * * *

On the other hand, the Supreme Court in *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436, has said that "In general, in matters relating to the revenue, the corporate form may be disregarded where it is a sham or unreal" but that—

The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation [2] or to avoid [3] or to comply with [4] the demands of creditors or to serve the creator's personal or undisclosed convenience,[5] *so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.* New Colonial Co. v. Helvering, 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348; Deputy v. Du Pont, 308 U.S. 488, 494, 60 S.Ct. 363, 366, 84 L.Ed. 416. * * * [Footnotes omitted and emphasis supplied.]

We cannot find from the record that the five Monette companies and Supreme are shams or that their gross income, deductions, credits, or allowances should be allocated to Incorporated, or that they should be denied the $25,000 surtax exemption provided for under section 11(c).

Each of the corporations had a business activity of its own and, with the exception of Supreme, was carrying on a business in a separate geographical location. Supreme's business was to handle a special account with Stokely in the manner fully set out in our findings. Each of the Monette companies had its own employees and its own separate books and records.

Respondent emphasized that the Monette companies and Supreme all operated under the trade name of "V. H. Monette and Company" and that the books were all kept at the home office either in Norfolk or Smithfield under the supervision of a certified public accountant. These factors do not, in our opinion, destroy the separate taxable entities of the several corporations. The same situation existed in the case of Incorporated and respondent concedes that corporation to be a valid taxable entity.

In short, the respondent contends that, while it was permissible for Monette to incorporate his sole proprietorship, once Incorporated was organized it was not necessary to decentralize the business into the six geographical areas for the reason that Monette had been able to operate a sole proprietorship with branch offices and that there was

no valid reason why Incorporated could not have done likewise. This we think overlooks the doctrine laid down by the Supreme Court in *Moline Properties, Inc.* v. *Commissioner, supra,* wherein the Supreme Court said that whatever the purpose of organizing a corporation might be, "so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." We think the Monette companies and Supreme meet the "separate taxable entity" test.

As an example of how the separate Monette companies carried on their businesses, we look at Southern, the largest of the group. It maintained an office at Atlanta, Ga. Jacqueline W. Hariston was the office manager and director of marketing for Southern since its inception. She also negotiated for the necessary leases. Prior to the time she became an employee of Southern, she worked for the individual proprietorship of Monette. She testified that Southern was "incorporated on the basis of trade area so we could get more decentralized authority to those that were actually in the trade area"; that she worked mostly in the office but at times would call at some of the commissaries to work out special problems there; that when the orders came in from the commissaries she would verify them for proper pricing and terms and forward them to the shipping point according to the manufacturer's instructions and procedures; that the orders were never sent to Norfolk or Smithfield (the home office) for action; that "we took all action on orders in our office"; and that—

we followed up to make sure the shipments arrived on time and in good order. And any loss or damage claims were handled in proper order. And on a hurry-up basis, if they asked us to expedite it, we would call, to see what we could do, to the shipping point to get the merchandise out to the people who needed it.

When asked what services would she say were performed for the manufacturers, Hariston answered:

A. Well, we would double check to make sure that the orders that we received for their goods had the proper price structure and met the proper method of shipment. And we would fill out any forms that they requested us to fill out regarding bills of lading or manufacturer's shipping documents, or what-have-you. We would keep warehouse inventories for the manufacturers if they would so request our services. And we would combine, in the case of Stokely Van Camp, for instance, truck-load shipments. We would solicit orders from the various commissaries in a specific geographic area and combine those orders together before sending them to the shipping point, so that one truck could make the delivery to all points in this specific area.

Hariston named four salesmen, James Stover, Ike Monette, Frank Matthews, and Charley Newman, who worked for Southern exclusively and never moved outside of Southern's area. As compensation they received a part of the commissions earned by Southern. During the years from fiscal 1954 to fiscal 1959, Southern's commissions grew from $79,961.53 to $421,267.16, or 426.8 percent. Monette, as presi-

dent of Southern, would solicit accounts from the manufacturers but would leave the selling of the merchandise to the salesmen of Southern. The latter always operated under the trade name of "V. H. Monette and Company." Southern also maintained an office in San Antonio, Tex. Hariston further testified that in about 1960 she was given 60 shares of stock in Southern.

We do not think it can reasonably be said from this example that Southern was not carrying on business as a separate taxable entity. What is true of Southern is likewise substantially true of the other Monette companies and Supreme.

Respondent relies heavily upon *Aldon Homes, Inc.*, 33 T.C. 582, and *Shaw Construction Co.*, 35 T.C. 1102, affd. 323 F. 2d 316 (C.A. 9, 1963). These cases dealt with numerous corporations engaged in the development of segments of a single tract of land. In *Aldon* there were 16 corporations and in *Shaw* there were 86 corporations. All of the corporations in each case respectively were controlled by a single group with essentially the same employees, on the same tract of land, and sold homes built with the same construction equipment. We see no analogy in *Aldon* and *Shaw* (where single tracts of land were developed) to the Monette companies where each of the corporations assumed full responsibility for a separate and distinct trade area. These trade areas, in combination, resulted in a division of the free world.

We think the instant case is more like *Bush Hog Manufacturing Co.*, 42 T.C. 713. In that case, as in the instant case, both sets of corporations did business under a trade name; the books of all the companies were kept at a home office; the officers were the same, respectively; no dividends were paid by either set; each set kept its own books and had its own salesmen and in both sets there were tax disadvantages as well as tax advantages. In that case, among other things, we said:

> We are convinced by the evidence and have found as a fact that the net income reported by the sales companies was earned by them and is not taxable to Manufacturing under section 61 of the Code. See *Chelsea Products, Inc., supra*, wherein we held for taxpayer under facts less favorable to the taxpayer but quite similar to the facts here. See also *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949); *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943).

In the instant case we hold that the Monette companies and Supreme should not be disregarded as shams but should be regarded as separate taxable entities in that the net income reported by the Monette companies and Supreme was earned by them and is not taxable to Incorporated under section 61. *Moline Properties, Inc.* v. *Commissioner, supra*, and *National Carbide Corp.* v. *Commissioner, supra*.

In his brief the respondent states that if this Court should hold that the separate identities of the Monette companies and Supreme are to be recognized for Federal income tax purposes "the respondent's determination attributing their income and expenses to Incorporated is authorized by the provisions of section 482 of the 1954 Code."

It may be noted that in the deficiency notice to Incorporated the respondent made no specific reference to section 482.[10] In a statement attached to the notice, he merely made adjustments to Incorporated's income for each of the fiscal years 1956 through 1959. The respondent then took an inconsistent position and determined deficiencies for each of the five Monette companies and Supreme so that he would be protected in case this Court decided Incorporated against him. Although the respondent in his determination made no specific reference to section 482 by determining that "the corporate identities of the six related corporations are to be disregarded for income tax purposes," he has, in effect, applied section 482 *in toto*. We see no justification, however, for such implied application.

Before the respondent may properly make any application pursuant to section 482, there must be present two fundamental elements or conditions. These are: (1) That the organizations or businesses involved be controlled by the same interests (see sec. 482), and (2) that income or expense which is allocated not be attributable to the activities or efforts of the entity which reported it but be attributable to the activities of the entity to which it is allocated. See *Grenada Industries, Inc.*, 17 T.C. 231, affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819.

Of course the first element or condition exists for it is a fact that during the taxable years here involved Monette owned all of the capital stock of the five Monette companies and Supreme. But the second element or condition is lacking.

The respondent's principal contention for the application of section 482 is that deductions were arbitrarily allocated among the several corporations so that each corporation's net income would fall just

---

[10] Sec. 482 of the 1954 Code is substantially the same as sec. 45 of the 1939 Code. In *Commissioner* v. *Chelsea Products,* 197 F. 2d 620 (C.A. 3, 1952), affirming 16 T.C. 840, the court noted that the Commissioner in that case gave the taxpayer no notice that he was proceeding under sec. 45 and, in this connection it said:

"The deficiency notices were thus deceptive and gave taxpayer no notice that the Commissioner was proceeding under Section 45. Since Section 45 grants the Commissioner discretionary powers the burden falls upon the taxpayer to prove that the Commissioner's determination is arbitrary. * * * This considerable power given the Commissioner certainly carries with it a correlative duty to give the taxpayer fair notice in advance of hearing that the Commissioner has proceeded under Section 45. The taxpayer can hardly shoulder its burden if it does not know the Commissioner has proceeded under Section 45 or if it does not know which transactions or group of transactions the Commissioner has determined to have resulted in distortions of true net income."

under the $25,000 surtax exemption allowed by section 11(c). We have been unable to find any facts which would support this allegation. Although it was within the power of the owner of all the stock of the seven corporations to shift income or deductions of the corporations so that each corporation would have less than $25,000 in each of the taxable years, this was not done.

The respondent has attempted to adjust the net income of the various corporations to reflect a division of Monette's salary purely upon the basis of commissions earned. There is no justification for this attempted adjustment. In the first place, Monette's principal effort was expended in dealing with manufacturers. His work with manufacturers would not necessarily have benefited all companies in proportion to the commissions earned because new accounts obtained did not produce income in the year the account was obtained. Furthermore, Monette's salary for each year of each corporation was determined long before the operating results were known. We have, therefore, rejected the respondent's conclusions in this matter.

Nor is there merit in respondent's contention that numerous and sundry journal entries were made transferring expenses between the various corporations. The evidence, however, shows only the allocation of overhead expenses and proper yearend adjustment of sales and office expense to reflect the correct net income for each corporation. There was no evidence of any improper attempt to shift income or expense from one corporation to another. Section 482 does not permit the Commissioner to allocate income and deductions between commonly controlled companies because the common owners have the *power* to shift income. It must be based on the *actual shifting* of income and deductions between commonly controlled businesses and not on what *might* be done. See *Bush Hog Manufacturing Co.*, wherein we said:

We do not think section 482 permits the Commissioner to allocate income and deductions between commonly controlled companies simply because he finds that the common owners have the *power* to shift income. He must determine that the allocation is necessary to prevent the evasion of taxes or to clearly reflect income. In order not to be arbitrary and unreasonable, such a determination must, in our opinion, be based on actual shifting of income or deductions between commonly controlled businesses which would result in an evasion of tax or would incorrectly reflect income—and cannot be based on the mere fact that it might be done.

The record in the instant case does not support a determination that the allocation of the income and deductions of the Monette companies and Supreme to Incorporated is necessary to prevent the evasion of taxes or clearly to reflect the income of the various corporations.

Under issue 2, since Monette during the years before us owned all the stock of Supreme and the Monette companies it is clear that under

section 269,[11] he had acquired "control" of these corporations. The real question, however, is whether under section 269 "the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance [the surtax exemption of $25,000] which such person or corporation would not otherwise enjoy." The determination of this "principal purpose" is a question of fact. *Bush Hog Manufacturing Co., supra* at 729.

Petitioners have shown, under issue 1, that the Monette companies and Supreme were not shams or tax-avoidance devices. Petitioners have also shown under issue 1 that these corporations had a business purpose for the utilization of the corporate structure. Monette testified at length as to the principal purpose for the organization of these corporations. Since prices within the military market were determined on the basis of zones and since most manufacturers followed pricing patterns corresponding to six geographical zones of delivery, it was Monette's intention substantially to decentralize along this geographical pattern.

We have carefully considered all the evidence of record and we cannot find that Monette's principal purpose in organizing these corporations was to obtain either for himself or any of the corporations a tax benefit which would not otherwise be enjoyed.

In the case of corporations with taxable years beginning before July 1, 1961, it may be noted that section 11 of the 1954 Code imposes a normal tax equal to 30 percent of the taxable income and a surtax equal to "22 percent of the amount by which the taxable income * * * exceeds $25,000." The Revenue Act of 1964 (Pub. L. 88–272, Feb. 26, 1964, sec. 121) changed these rates for taxable years beginning after December 31, 1963, and prior to January 1, 1965, to a normal tax equal to 22 percent of the taxable income and a surtax equal to 28 percent of the amount by which the taxable income exceeds the surtax exemption. The net tax reduction on a taxable income of $100,-000 would be $3,500 as shown in the margin.[12] In explanation of this

---

[11] Sec. 1551 of the 1954 Code is not applicable here and respondent does not contend that it is.

[12]

| | Under law prior to 1964 Act | | Under 1964 Act for years after Dec. 31, 1963, and prior to Jan. 1, 1965 | |
|---|---|---|---|---|
| Normal tax | 30 percent of $100,000 | $30,000 | 22 percent of $100,000 | $22,000 |
| Surtax | 22 percent of $75,000 | 16,500 | 28 percent of $75,000 | 21,000 |
| Total tax | | 46,500 | | 43,000 |
| Under 1964 Act | | 43,000 | | |
| Tax reduction | | 3,500 | | |

change, H. Rept. No. 830, 88th Cong., 2d Sess., pp. 149–150, said in part:

> While the House and your committee recognize the advantages of use of multiple corporations, it is believed, as it has been in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area *or conduct the same type business in different geographical locales,* there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, *retaining the benefit of use of multiple surtax exemptions.* \* \* \* [Emphasis supplied.]

We hold that respondent erred in disallowing the surtax exemptions to Supreme and the Monette companies. *Bush Hog Manufacturing Co., supra.*

### Issues 3, 4, 7, 8, and 10

#### FINDINGS OF FACT

In a statement attached to the deficiency notice in docket No. 1313–63, the respondent *increased* the taxable income disclosed by Monette and Nannie's joint returns for the calendar years here indicated by two adjustments, as follows:

| Adjustments | 1955 | 1957 | 1958 | 1959 |
|---|---|---|---|---|
| Dividend income (increased) | $76,923.50 | $39,894.77 | $44,256.90 | $17,376.06 |
| Farm loss (disallowed) | 24,122.22 | 52,167.86 | 49,941.72 | 22,976.27 |

In a statement attached to the deficiency notice in docket No. 1314–63, the respondent *increased* the taxable income disclosed by the return[13] for the calendar year 1956 by two adjustments, (a) dividend income increased $81,031.10, and (b) farm loss decreased $47,427.92.

In 1942 Monette purchased a "broken down farm" of 448 acres in Isle of Wight County, near Smithfield, Va., and immediately remodeled an old house there. Monette and his family of five have continuously lived on the farm since 1943.

Among the buildings and facilities situated on Smithfield Farm were Monette's private residence, a barbecue shelter, a swimming pool, a boathouse, a filtration building containing filtration equipment for the swimming pool, a tennis court, a pumphouse, four dwelling houses, a storage building and deer shelter, a garage, an old milkhouse, two barns and a cattle shed, a silo, several sheds, an implement building, and an irrigation pumphouse.

Monette maintained a Guernsey herd on Smithfield Farm from approximately 1942 to 1947 when the herd was sold. Monette invested

---

[13] Whether this return for 1956 is a joint return of Monette and his wife or the separate return of Monette is the subject matter of issue 8.

the proceeds from the sale in his commission business. From 1947 to approximately 1953 Monette was not engaged in any farming or cattle-breeding activities.

In approximately 1953 Monette commenced to raise purebred Angus cattle on Smithfield Farm. At that time he acquired approximately 15 head of cattle. Generally, there are 35 mature animals on the farm, plus some calves. The herd was not maintained for commercial beef purposes but was a purebred registered herd used for breeding. Income from such an endeavor is derived mainly from the sale of the offspring of cattle.

In approximately 1957 Monette purchased five deer for the enjoyment of his children. The deer have been maintained on the farm and have been loaned to the Navy several times at Christmas.

During the taxable years 1955 through August 1, 1959, additions and improvements made at Smithfield Farm were in total amounts as follows:

| Year or period | Amount |
| --- | --- |
| Dec. 31, 1955 | $35, 399. 23 |
| Dec. 31, 1956 | 71, 723. 79 |
| Dec. 31, 1957 | 41, 810. 95 |
| Dec. 31, 1958 | 7, 164. 55 |
| Aug. 1, 1959 | 7, 600. 39 |
| Total | 163, 698. 91 |

Approximately 110 acres of the Smithfield Farm property are devoted to maintaining the Angus herd. Of that acreage approximately 30 to 40 acres are used for raising alfalfa hay for feeding purposes. The major portion of the 448 acres is marshland used as pasture for the cattle. There are 26 acres of oysterbeds.

Smithfield Farm is located outside of what is normally considered cattle country and qualified farm personnel are not readily available. The cattle on Smithfield Farm are show cattle and used primarily for display purposes. A big display of the cattle was made when the office building in Smithfield was opened in 1957.

Monette made it a practice to accommodate business guests at the farm, providing them with both meals and lodging. Substantial improvements and renovations have been made for the purposes of accommodating guests, including children. A limousine was furnished to transport visiting guests from the local airport to the farm. Guests accommodated included manufacturers and military personnel.

Monette sought professional help in purchasing and in culling his herd.

By deed dated August 31, 1956, approximately 5 acres of Smithfield Farm were deeded to East Export for the purpose of erecting an office building thereon. The stated selling price was $10,000, which amount was *credited* to Monette's account on the books of East Export. A capital gain in the amount of $9,500 was reflected in the 1956 income tax return filed in the name of "Valmore H. and Nannie B. Monette" as a result thereof.

On January 2, 1957, the office building erected on Smithfield Farm was occupied.

The operation of the Smithfield Farm resulted in a net loss for each of the years 1955 through August 1, 1959, in amounts as follows:

| Year | Actual income | Actual expenses | Net loss |
|------|-------------|---------------|----------|
| 1955 | $1,245.00 | $25,424.99 | $24,179.99 |
| 1956 | 1,541.17 | 49,100.86 | 47,559.69 |
| 1957 | 2,858.67 | 55,814.87 | 52,956.20 |
| 1958 | 1,333.25 | 51,530.16 | 50,196.91 |
| 1959 | 4,360.00 | 27,336.27 | 22,976.27 |
| Total | 11,338.09 | 209,207.15 | 197,869.06 |

Included in the above actual expenses were small amounts for taxes which amounts have been allowed by the respondent.

At the time the corporations were organized in 1953, Monette loaned the corporations money. On December 31, 1953, the corporations were indebted to Monette for such loans in amounts as follows:

| | |
|---|---|
| Incorporated | $12,753.64 |
| East Export | 4,948.10 |
| East Domestic | 3,186.74 |
| West Export | 1,897.33 |
| West Domestic | 2,503.67 |
| Southern | 5,566.58 |

An account payable account captioned "V. H. Monette" was set up on the books of each of the corporations showing the above indebtedness. An account payable account captioned "V. H. Monette" was also set up on the books of V. H. Monette Watch Division, Inc. (a corporation not involved herein as a petitioner), showing an indebtedness owing Monette on December 31, 1953, of $1,059.71.

Subsequently, Monette borrowed from these corporations funds for use primarily in connection with the Smithfield Farm. He made payments on the borrowed amounts from time to time and had portions of his salary from each of the corporations credited to each of the

account payable accounts, respectively. The balances in these accounts at the end of the years after 1953 were as follows:

| Name of corporation | Date | Debit balance | Credit balance |
|---|---|---|---|
| Incorporated | Oct. 31, 1954 | | $12,080.96 |
| | Oct. 31, 1955 | | 14,824.96 |
| | Oct. 31, 1956 | | 2,640.96 |
| | Oct. 31, 1957 | $10,332.40 | |
| | Oct. 31, 1958 | 81,636.18 | |
| | Oct. 31, 1959 | 824.94 | |
| East Export | Oct. 31, 1954 | 9,812.00 | |
| | Oct. 31, 1955 | 22,331.12 | |
| | Oct. 31, 1956 | | 8,795.95 |
| | Oct. 31, 1957 | 33,347.97 | |
| | Oct. 31, 1958 | 42,032.52 | |
| | Oct. 31, 1959 | None | None |
| East Domestic | Oct. 31, 1954 | 5,731.85 | |
| | Oct. 31, 1955 | 14,371.85 | |
| | Oct. 31, 1956 | 32,829.35 | |
| | Oct. 31, 1957 | 46,829.35 | |
| | Oct. 31, 1958 | 52,929.35 | |
| | Oct. 31, 1959 | None | None |
| West Export | Oct. 31, 1954 | 5,164.90 | |
| | Oct. 31, 1955 | 16,812.87 | |
| | Oct. 31, 1956 | 37,262.87 | |
| | Oct. 31, 1957 | 49,357.37 | |
| | Oct. 31, 1958 | 50,665.37 | |
| | Oct. 31, 1959 | None | None |
| West Domestic | Oct. 31, 1954 | 3,432.02 | |
| | Oct. 31, 1955 | 11,786.77 | |
| | Oct. 31, 1956 | 29,736.77 | |
| | Oct. 31, 1957 | 19,831.27 | |
| | Oct. 31, 1958 | 25,331.27 | |
| | Oct. 31, 1959 | None | None |
| Southern | Oct. 31, 1954 | 19,316.65 | |
| | Oct. 31, 1955 | 54,734.19 | |
| | Oct. 31, 1956 | 60,838.19 | |
| | Oct. 31, 1957 | 65,777.45 | |
| | Oct. 31, 1958 | 30,571.95 | |
| | Oct. 31, 1959 | None | None |
| Supreme | Aug. 31, 1955 | | 441.48 |
| | Aug. 31, 1956 | 18,605.72 | |
| | Aug. 31, 1957 | 5,400.22 | |
| | Aug. 31, 1958 | | 14,005.28 |
| | Aug. 31, 1959 | 25.00 | |
| V. H. Monette Watch Division, Inc. | Oct. 31, 1954 | 1,123.57 | |
| | Oct. 31, 1955 | 4,653.17 | |
| | Oct. 31, 1956 | 9,153.17 | |
| | Oct. 31, 1957 | 11,053.17 | |
| | Oct. 31, 1958 | 11,053.17 | |
| | Oct. 31, 1959 | None | None |
| V. H. Monette Coffee Division Corp. | Mar. 31, 1957 | 12,900.00 | |
| | Mar. 31, 1958 | 13,900.00 | |
| | Mar. 31, 1959 | None | None |

Monette gave each of the above nine corporations non-interest-bearing notes for the debit balances.

On October 15, 1957, Monette executed his will and testament, which provided in part as follows:

Stock owned by me in V. H. Monette East Coast Export Corporation, V. H. Monette East Coast Domestic Corporation, V. H. Monette West Coast Export Corporation, V. H. Monette West Coast Domestic Corporation, V. H. Monette Southern Corporation, V. H. Monette & Company, Incorporated, V. H. Monette Coffee Division Corporation, V. H. Monette Watch Division, Incorporated, and Supreme Products Corporation, is left in its entirety, directly without obligations, and equally to: Gordon D. Pray, Ike Monette, Pauline D. Harrison, and John F. Shine. It is my desire that they continue to carry on my business in the manner in which it has previously been operated, using its present name.

Title to my interest in the farm property and cattle herd, located on Lots 36, 37 and 38, consisting of 440 acres more or less, will be transferred to above

listed corporations, and be operated by the said Gordon D. Pray, Ike Monette, Pauline D. Harrison and John F. Shine.

By deed dated August 1, 1959, Monette, individually, conveyed Smithfield Farm to the above nine corporations (Incorporated, the five Monette companies, Supreme, Watch, and Coffee). The deed was not recorded until December 4, 1959. Nannie did not join in the execution of the deed as she was ill at the time. By instrument dated April 6, 1961, and duly recorded of record on April 17, 1961, Nannie quitclaimed her interest in said property to the aforementioned vendees.

The transfer of the farm property from Monette was recorded on the books of Incorporated, the Monette companies, Watch, and Coffee, by journal entries dated October 31, 1959, by a debit to "Farm Investment" and a credit to "V. H. Monette—Loans Payable" in the following amounts:

| Corporation | Amount |
| --- | --- |
| Incorporated | $81, 293. 58 |
| West Domestic | 25, 331. 27 |
| West Export | 50, 665. 37 |
| East Export | 40, 634. 46 |
| Southern | 30, 571. 95 |
| East Domestic | 52, 929. 35 |
| Watch | 11, 053. 17 |
| Coffee | 13, 900. 00 |
| Total | 306, 379. 15 |

The Smithfield Farm had been duly appraised at its fair market value prior to the August 1, 1959, transfer. The transfer was made in consideration of the cancellation of Monette's indebtedness to the corporations. After the transfer was completed, the only debit balances remaining in the accounts with the above nine corporations were $824.94 in the account with Incorporated and $25 in the account with Supreme.

In the joint return filed by Monette and Nannie for the calendar year 1959, a long-term gain of $55,510.56 was reported on the sale of "Farm—including all land, buildings and equipment." The gross sales price was reported at $305,499.27. The respondent has made no adjustment in connection with this reported gain.

Subsequent to August 1, 1959, income and expenses of Smithfield Farm were reflected on the books of the various corporate petitioners.

The farm losses claimed in the Federal income tax returns of Incorporated and the Monette companies for their respective taxable years ended October 31, 1959, and the farm loss claimed on the Federal income tax return of Supreme for its taxable year ended August 31, 1959, were incurred during said taxable periods.

Smithfield Farm has never operated at a profit.

In the respective statements attached to the deficiency notices, the respondent, in the determination for the fiscal year ending October 31, 1959, of Incorporated and the Monette companies and in the determination for the fiscal year ending August 31, 1959, of Supreme increased the taxable income reported by these corporations by disallowing a deduction claimed by these corporations for "Farm loss" in amounts as follows:

| Corporation | Farm loss disallowed |
| --- | --- |
| Incorporated | $11,687.05 |
| East Export | 1,738.51 |
| East Domestic | 2,005.24 |
| West Export | 1,922.50 |
| West Domestic | 944.76 |
| Southern | 1,167.54 |
| Supreme | 632.20 |
| Total | 20,097.80 |

ULTIMATE FACTS RE ISSUES 3, 4, 7, 8, AND 10

All of the amounts advanced to Monette or payments made in his behalf by the various corporations during the years 1955 through 1959 were bona fide loans to Monette and not constructive dividends.

The operation of Smithfield Farm by Monette as an individual from 1955 through August 1, 1959, was operated as a hobby and not as a trade or business. After August 1, 1959, and for the remainder of the fiscal year of the respective corporate petitioners, the latter have failed to show the composition of the farm losses disallowed by the respondent in the total amount of $20,097.80.

The assessment and collection of deficiencies determined by the respondent against Monette and/or his wife for the taxable years 1955 and 1956 are barred by the statute of limitations.

OPINION RE ISSUES 3, 4, 7, 8, AND 10

Respondent has determined that the net amounts advanced to Monette, including certain payments made in his behalf, by the nine corporations mentioned in our Findings of Fact were not bona fide loans but were taxable to Monette and/or his wife as dividend income. The determination of this question is one of fact. *Victor Shaken*, 21 T.C. 785, 792.

Both parties agree "that the statute of limitations has expired as to the taxable years 1955 and 1956 of V. H. Monette and/or Nannie B. Monette unless it is held that section 6501(e) of the Internal Revenue Code of 1954 is applicable." In *Elizabeth H. Bardwell*, 38 T.C. 84, 92, affirmed without discussion of this point 318 F. 2d 786 (C.A. 10, 1963), we said:

To invoke the 6-year statute of limitations provided for in section 6501(e)(1) (A),[6] the respondent has the burden of proving that petitioner omitted "from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated on the return." *Lois Seltzer*, 21 T.C. 398 (1953). [Footnote omitted.]

Both parties also agree that if we decide issue 3 for petitioners for 1955 and 1956 then the said statute of limitations has expired for those years.

We think the evidence is convincing that the net amounts advanced to Monette, including certain payments made in his behalf, by the nine corporations mentioned in our Findings of Fact during the years 1955 through 1959 were bona fide loans to Monette and not constructive dividends and we have so found as an ultimate fact. We have set out in our findings the debit and credit balances of Monette's account with the various corporations at the close of each of the respective years. Whenever there was a debit balance in any account Monette would give his promissory note to the respective corporation for the amount owing that corporation. True, the notes were non-interest-bearing but Monette explained that the reason for that was that he had intended the loans to him by the corporations to be temporary as the money was borrowed primarily for the farm and he had at all times intended to transfer the farm to the corporations. Monette made payments on the borrowed amounts from time to time and had portions of his salary credited to his account with the various corporations. The funds Monette borrowed from these corporations were borrowed primarily for use in connection with the Smithfield Farm. From the time Monette organized the corporations it had been his intention eventually to transfer the farm to the corporations.

Finally, on August 1, 1959, Monette deeded the Smithfield Farm to the corporations. He first had the farm appraised at its fair market value. This appraisal, which, by the way, is agreed to by the respondent, was at a figure in excess of the amounts Monette then owed the several corporations.

The respondent contends, however, that this transfer of the farm to the corporations was a sham as it did not occur until after the Commissioner commenced auditing Monette's and the corporations' returns on June 9, 1959. There is no merit in this contention. Monette testified that from the time the corporations were organized he had intended to transfer the farm to the corporations. This intention is also consistent with his will and testament executed on October 15, 1957, excerpts from which we have set out in our findings. Furthermore, Monette and his wife in filing their joint return for 1959 reported a long-term capital gain of $55,510.56 on the sale on August 1, 1959, of "Farm— including all land, buildings, and equipment" for a gross sales price

of $305,499.27. The respondent, in his determination, made no adjustment on account of this reported gain which, of course, is inconsistent with his present contention that the transfer was a sham. In his brief, however, the respondent rather belatedly states, "If the Court concludes, as respondent contends, that the transfer of the farm was a sham, proper allowance should be made with respect to the tax paid by Monette on the reported gain."

As to issue 3, we hold that the respondent erred in increasing the taxable income disclosed by Monette's and/or Nannie's joint returns for the years 1955 through 1959 in the respective amounts of $76,-923.50, $81,031.10, $39,894.77, $44,256.90, and $17,376.06. In view of what we previously said regarding the statute of limitations, this holding on issue 3 automatically disposes of issues 7, 8, and 10.

The farm loss issue under issue 4 must be considered for two separate periods, namely, the years 1955 through August 1, 1959, when the farm losses were claimed by Monette and/or his wife in the returns filed for the calendar years 1955 through 1959; and the period after August 1, 1959, when the farm losses were claimed by Incorporated, the Monette companies, and Supreme for their respective fiscal year 1959. Under both periods petitioners primarily contend that the farm was operated as a business and that either the expenses are deductible under section 162 [14] or the losses are deductible under section 165.[15] As a secondary argument petitioners in their brief say, "All of these expenses should be allowed as 'paid or incurred' for the production or collection of income and treated as deductible" under section 212.[16]

We do not think petitioners are entitled to any deduction for the farm losses other than the small deduction for taxes which the respondent has allowed. In *Estate of Mortimer B. Fuller*, 9 T.C. 1069, affirmed per curiam 171 F. 2d 704 (C.A. 3, 1948), certiorari denied 336 U.S. 961, we said:

A taxpayer who operates a farm primarily for his own recreation or pleasure rather than on a commercial basis for the purpose of making a profit is not entitled to deduct annual farm losses as ordinary and necessary expenses of a business or as losses incurred in a business. * * *

---

[14] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

[15] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

* * * * * * *

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * *

[16] SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

As set out in our findings, Monette sustained substantial farm losses in every year from 1955 through August 1, 1959, with no showing of any reasonable expectation of future profit. His total income during this period from the operation of Smithfield Farm was only $11,338.09 while his expenses amounted to $209,207.15. His total losses were $197,869.06. From such a showing we cannot find that there was present any "genuine profit motive." See *Lamont* v. *Commissioner*, 339 F. 2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. In that case, Chief Judge Lumbard, among other things, said:

For the purpose of qualifying for deductions under §§ 162(a) and 165 (c) (1), a course of activity must be considered to be a trade or business. It is well established that the existence of a genuine profit motive is the most important criterion for the finding that a given course of activity constitutes a trade or business. * * *

\* \* \* \* \* \* \*

While the expectation of profit need not be a reasonable one, and the business need not realize an immediate profit, the activities must be entered into and carried on in good faith for the purpose of making a profit. * * *

We are unable to find that the operation of the Smithfield Farm was ever "carried on in good faith for the purpose of making a profit." The large losses sustained year after year speak for themselves.

In an early case [17] Judge Learned Hand, in ascertaining whether the operation of a farm was conducted with the requisite profit motive, remarked, "the crux of the determination" is the receipts and disbursements. Applying that test to the facts in the instant case leaves Monette far from a favorable decision as to the deductibility of these losses.

We think the facts here are very much like the facts in *Louis Greenspon*, 23 T.C. 138 (issue II), affirmed on this issue 229 F. 2d 947 (C.A. 8, 1956). In that case the taxpayer acquired a farm and made it his home. The farm was landscaped and converted into a horticultural showplace where business guests were entertained. A substantial part of the expenses of establishing and maintaining the farm was allocated to Greenspon's controlled corporations which claimed deductions therefor as ordinary and necessary business expenses on the ground that the farm was utilized as an important part of sales promotion. In sustaining the Commissioner's disallowance of all the claimed deductions pertaining to the farm by both Greenspon and his controlled corporations, we said, in part:

It is well established, of course, that promotional expenses and reasonable expenses for entertaining clients and customers are ordinary and necessary business expenses.[6] There must, however, be a reasonably direct relationship between the expenditures and the business advantages which are expected or actu-

---

[17] *Thacher* v. *Lowe*, 288 F. 994 (S.D.N.Y. 1922).

48

ally realized. It is equally certain that personal entertainment and personal living expenses cannot be charged off as business expenses. The classification of a particular expenditure is a matter of fact and depends on the circumstances of each case. *Louis Boehm,* 35 B.T.A. 1106.

The burden of proof is on the petitioners to show that the farm expenses paid by the corporations were legitimate business expenses. We do not think that burden is met by showing that, periodically, business associates, or potential customers, were entertained at the farm. This is nothing more than the usual practice in the business community; corporate officers often entertain as guests the clients or customers of their corporations. The expenses incurred in such entertainment are not usually business expenses of the corporations. * * * [Footnote omitted.]

We have not overlooked the cases cited by petitioners in their brief. It is sufficient to say that these cases are all distinguishable from the instant case on their facts. Under the circumstances here present, we think that the losses that were realized year after year negative any finding that petitioners were engaged in carrying on business in good faith for the purpose of making a profit. *Lamont v. Commissioner, supra.* We have found as an ultimate fact that the farm was operated as a hobby and not as a trade or business.

Neither can we find that the expenses in operating the Smithfield Farm were for the production or collection of income and we, therefore, find petitioners' secondary argument to be without merit.

The total losses claimed by Incorporated, the Monette companies, and Supreme for the short period in 1959 following August 1, 1959, amounted to a total of $20,097.80. No evidence was introduced showing the items making up these losses as was done in the case of the $197,869.06 of losses claimed by Monette. To that extent the corporate petitioners have failed in their proof. The petitioners have failed to establish that the respondent erred in disallowing the farm losses totaling $20,097.80 in the case of the corporate petitioners.

We sustain the respondent's determination as to issue 4.

*Issue 5*

FINDINGS OF FACT

Albright became an employee of Stokely in 1946. During the years 1955 through 1959 his position with Stokely was that of military sales manager on a full-time basis.

Originally, Stokely paid Monette a commission of approximately 2½ percent to 3 percent with respect to sales of its products. About 1948 this rate was later negotiated up to 4 percent, which was considered a proper rate for that type of business. The 4-percent rate was in effect during the taxable years here in question.[18]

As an employee of Stokely and also of Supreme, Albright would from time to time accompany the salesmen of Incorporated and the

---

[18] See three full paragraphs of our findings under issues 1 and 2, *supra,* beginning with the paragraph saying "Fenton Albright," etc.

Monette companies in their calls upon military installations. Albright rendered a valuable service to these corporations, which corporations paid Supreme for such service. Albright, as compensation for the services so rendered, was paid by Supreme.

Stokely was unaware that Albright was accepting compensation from Supreme. In 1960, within a month after it was disclosed to the management of Stokely that Albright had been receiving compensation from Supreme, he was retired from the company. The 4-percent commission rate continued after Albright retired from Stokely.

Forms 1099, U.S. Information Return, were filed in the name of Supreme, indicating that salaries or commissions were paid to Albright in the calendar years 1955 to 1959, inclusive.

Supreme incurred, accrued, and deducted as ordinary and necessary expenses for Albright's commissions or consultant's fees for the fiscal years 1956 through 1959 amounts as follows:

| TYE Aug. 31— | Amount |
|---|---|
| 1956 | $13,921.73 |
| 1957 | 19,882.46 |
| 1958 | 15,881.60 |
| 1959 | 17,726.36 |

The respondent determined that the said claimed deductions were not allowable and such disallowance is reflected in the determination of the deficiencies of Incorporated for the taxable years ended October 31, 1956, to October 31, 1959, inclusive, and, alternatively, in the deficiencies determined with respect to Supreme for its taxable years ended August 31, 1957, to August 31, 1959, inclusive, in the event its separate corporate identity for Federal tax purposes is recognized.

Commissions paid and/or accrued to Albright were for actual services rendered and did not result in increased costs to Stokely because the 4-percent commission on sales was a proper rate for that type of business and continued after Albright retired in 1960.

### OPINION RE ISSUE 5

Petitioner Supreme contends that the amounts it deducted as consultant's fees paid and/or accrued to Albright are allowable as deductions under section 162.[19] Respondent contends that the payments were in fact in the nature of kickbacks and as such are not deductible, citing *United Draperies, Inc.*, 41 T.C. 457, affd. 340 F. 2d 936 (C.A. 7, 1964), certiorari applied for May 3, 1965; and *Frederick Steel Co.*, 42 T.C. 13, 24–25, on appeal (C.A. 6).

The payments made to Albright by Supreme are not "kickbacks"

[19] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

as that term is used in the cases cited by the respondent. The important difference in the instance of the sales consultant fee paid by Supreme is that neither Stokely nor Albright had the power of decision of whether to buy or not to buy. The choice of buying rested exclusively with the commissary officers at each individual commissary. If the payments in question had been made to one of the commissary officers, then we might have a situation more like the situations present in *United Draperies, Inc.*, and *Frederick Steel Co.* But the payments in question were not made to one of the commissary officers; they were made to Albright by Supreme.

The payments were made to Albright by Supreme as compensation for personal services actually rendered for the benefit of Supreme. The fact that suggests criticism of the payments made to Albright by Supreme, if criticism is to enter the picture, is that Albright while so acting as an employee of Supreme was the military sales manager of Stokely and as military sales manager of Stokely it was one of his duties to accompany the various salesmen in their calls upon the various commissaries. In other words, Albright was being paid by both Supreme and Stokely for doing the same job. Both Supreme and Stokely were interested in selling as much of the Stokely products to the commissaries as possible. Monette, as president of Supreme, engaged Albright to work directly with the salesmen selling the Stokely products, which Albright did at the request of the salesmen. The evidence shows that Albright put forth an extra effort and as a result the sales of Stokely products exceeded all other products and amounted to over $6,500,000 annually. True, Albright was an employee of Stokely. But he was also an employee of Supreme and the parties have so stipulated (stipulation, par. 19). However, the stipulation also adds that "Respondent does not concede or admit that Fenton Albright was an employee of Supreme Products Corporation at any time hereto *entitled to receive compensation for services.*" (Emphasis added.) It was agreed between Monette and Albright that the latter was to receive compensation. Ordinarily, employees are entitled to receive compensation for their services and, if reasonable, such compensation is allowable as an ordinary and necessary expense in carrying on any trade or business unless there be a question of public policy involved. The respondent has not shown any frustration of public policy. Certainly there can be no frustration of public policy involved in Albright's putting forth an extra effort to sell more Stokely goods. It would seem that both Supreme and Stokely would be the beneficiaries of such extra effort. Albright's arrangement with Monette as president of Supreme was an arm's-length arrangement. This was a completely open transaction as far as Supreme was concerned; because all payments to Albright were reported to the Federal Government on the required Form 1099 as compensation.

It may be noted in passing that the amount of $13,921.73 deducted on the return of Supreme for the fiscal year ending August 31, 1956, was allowed by the respondent as an ordinary and necessary expense in a previous audit of that return in 1959, and is not now involved, since under issue 1 we have held Supreme to be a separate, distinct, viable legal entity for the years 1956 to 1959, inclusive, and no deficiency was determined against Supreme for 1956.

We hold that the commissions paid to Albright and deducted by Supreme for the fiscal years 1957 through 1959 are reasonable compensation for services actually rendered and should be allowed under section 162, *supra*. Cf. *Paramount Finance Co.* v. *United States*, and *Kirtz* v. *United States*, 304 F. 2d 460 (Ct. Cl. 1962) ; *Roy Marilyn Stone Trust*, 44 T.C. 349.

## *Issue 6*

### FINDINGS OF FACT

Deductions for compensation of Monette claimed by Incorporated, the Monette companies, and Supreme in the returns filed for the fiscal years 1956 through 1959, and the amounts disallowed by the respondent in the respective deficiency notices, are as follows (Note: No deficiencies were determined against the Monette companies and Supreme for 1956) :

| Petitioner | Fiscal year 1956 | | Fiscal year 1957 | |
|---|---|---|---|---|
| | Claimed | Disallowed | Claimed | Disallowed |
| Incorporated | $2,000 | [1] $16,375.00 | $10,000 | [1] $25,000.00 |
| East Export | 42,000 | See note | 20,000 | 4,305.50 |
| East Domestic | 2,000 | do | None | None |
| West Export | 2,000 | do | 11,000 | 1,058.75 |
| West Domestic | 2,000 | do | 14,000 | 4,825.25 |
| Southern | 34,375 | do | 20,000 | None |
| Supreme | 7,000 | do | 25,000 | 20,708.50 |
| Total [2] | 91,375 | do | 100,000 | [3] 30,898.00 |

| Petitioner | Fiscal year 1958 | | Fiscal year 1959 | |
|---|---|---|---|---|
| Incorporated | 900 | [1] 30,400.00 | 900 | [1] 3,400.00 |
| East Export | 23,000 | 6,548.75 | 9,000 | None |
| East Domestic | 500 | None | 500 | None |
| West Export | 500 | None | 500 | None |
| West Domestic | 500 | None | 500 | None |
| Southern | 55,000 | 30,844.00 | 42,000 | 18,890.25 |
| Supreme | 25,000 | 20,525.50 | 25,000 | 20,832.25 |
| Total [2] | 105,400 | [3] 57,918.25 | 78,400 | [3] 39,722.50 |

[1] The amount shown as disallowed in the deficiency notice to Incorporated is the aggregate disallowance of all seven corporations on the basis that the Monette companies and Supreme are to be disregarded and their combined net income imputed to Incorporated.

[2] The total shown here as "Disallowed" pertains to the Monette companies and Supreme only, and is in issue only in the event issue 1 is decided against respondent.

[3] It may be noted that if the Monette companies and Supreme are to be disregarded, the respondent would disallow for all seven corporations for 1957, 1958, and 1959 the amounts of $25,000, $30,400, and $3,400, respectively, but if the Monette companies and Supreme are *not* to be disregarded, the respondent would disallow for those *six* corporations for 1957, 1958, and 1959 the amounts of $30,898, $57,918.25, and $39,722.50, respectively.

The commissions earned by each of the seven corporations for the fiscal years 1957, 1958, and 1959 and the percentage that such commissions in each year bears to the total commissions for all the corporations, together with the percentage of $75,000 which the respondent in certain of the deficiency notices allowed as Monette's salary as claimed by certain of the corporations for certain years, are as follows:

| Petitioner | Fiscal year 1957 | | |
|---|---|---|---|
| | Commissions | Percent of total | Percent of $75,000 |
| Incorporated | $66,401.64 | 6.5 | |
| East Export | 208,621.44 | 20.4 | 20.926 |
| East Domestic | 116,205.49 | 11.4 | |
| West Export | 136,690.76 | 13.4 | 13.255 |
| West Domestic | 126,155.76 | 12.4 | 12.233 |
| Southern | 307,438.55 | 30.1 | |
| Supreme | 59,002.08 | 5.8 | 5.722 |
| Total | 1,020,515.72 | 100.0 | 52.136 |
| | Fiscal year 1958 | | |
| Incorporated | 52,324.64 | 4.7 | |
| East Export | 238,216.18 | 21.2 | 21.935 |
| East Domestic | 132,516.43 | 11.8 | |
| West Export | 131,494.67 | 11.7 | |
| West Domestic | 132,568.85 | 11.8 | |
| Southern | 367,468.77 | 32.7 | 32.208 |
| Supreme | 68,064.03 | 6.1 | 5.966 |
| Total | 1,122,653.57 | 100.0 | 60.109 |
| | Fiscal year 1959 | | |
| Incorporated | 59,282.14 | 4.4 | |
| East Export | 278,516.39 | 20.7 | |
| East Domestic | 170,310.29 | 12.7 | |
| West Export | 179,073.46 | 13.3 | |
| West Domestic | 161,547.13 | 12.0 | |
| Southern | 421,267.16 | 31.3 | 30.813 |
| Supreme | 75,970.15 | 5.6 | 5.557 |
| Total | 1,345,966.72 | 100.0 | 36.370 |

Gordon D. Pray was executive vice president of West Export and West Domestic. He devoted his full time to these corporations. As compensation he was paid the following amounts:

| FYE Oct. 31— | West Export | West Domestic |
|---|---|---|
| 1956 | $10,183.31 | $10,183,31 |
| 1957 | 26,000.00 | None |
| 1958 | 26,000.16 | None |
| 1959 | 18,200.00 | 7,800.00 |

ULTIMATE FACT RE ISSUE 6

The salaries voted Monette and claimed by Incorporated, the Monette companies, and Supreme for each of the taxable years constituted

reasonable compensation for personal services actually rendered by Monette for each of those years.

Regarding this issue, the respondent first determined that, on the basis that the Monette companies and Supreme are to be disregarded, no more than $75,000 should be allowed Monette as salary for any year for the services he performed for the whole enterprise. This was of course arbitrary and unreasonable as it did not take into consideration the value of Monette's services for any particular year. It is difficult to rationalize a determination that says a man is worth $75,000 in 1959 but not worth $78,400. But, on the basis that the Monette companies and Supreme are *not* to be disregarded, the rationalization becomes more difficult. Of the $78,400 claimed by all seven corporations in 1959 the respondent proposes to disallow $39,722.50 instead of $3,400.

In analyzing the compensation, it should be noted that the smallest salaries were paid by the West Coast companies, West Export and West Domestic. Pray served both of these corporations as executive vice president and assumed many of the functions Monette served in the corporations near his Virginia base of operations.

All the salaries paid Monette were voted by the board of directors for each corporation. In determining the reasonableness of Monette's salaries, it should be noted that Monette personally solicited the manufacturers' accounts for sales to the military on a commission basis. The securing of these manufacturers' accounts was a prime factor in the earnings of the several corporations. As a result of Monette's efforts, commission income of the various companies increased substantially from 1954 to 1959. As set out in our findings, the increases were from a low of 62.9 percent in the case of Incorporated to over 426 percent in the case of Southern. When it is considered that the commissions constituted approximately 5 percent of total sales, then sales in every year exceeded $20 million. Monette directed this worldwide sales organization. We think he was well worth the money he was paid.

On this issue we hold the respondent erred in disallowing any of the compensation voted and paid Monette for the personal services actually rendered by him.

## The Remaining Issues

As stated in our opening statement, issues 11, 12, and 13 are considered as abandoned; and as stated in our Opinion, *supra*, our holding on issue 3 automatically disposes of issues 7, 8, and 10. This leaves issues 9, 14, and 15. However, in view of our holding on issue 1, these issues become moot.

*Decisions will be entered under Rule 50.*