MAURICE C. DREICER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dreicer v. Commissioner
Docket No. 5407-76.
United States Tax Court
T.C. Memo 1979-395; 1979 Tax Ct. Memo LEXIS 132; 39 T.C.M. (CCH) 233; T.C.M. (RIA) 79395; September 24, 1979, Filed *132 P traveled around the world allegedly to obtain material for a book about dining and tourism. Over a number of years, he incurred substantial losses from his endeavor, and in no year did he make a profit. Although he wrote a manuscript, he never secured nor vigorously pursued its publication. P had substantial income from other sources which allowed him to sustain his losses. Held, based on all the facts and circumstances, P's activity was not conducted for profit within the meaning of sec. 183, I.R.C. 1954. Jerome Kamerman and Steven Kamerman, for the petitioner. Arthur H. Boelter, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioner's Federal income taxes of $13,133.55 for 1972 and $16,047.33 for 1973. The petitioner has conceded certain issues, and the only issue remaining for decision is whether the petitioner's activity of traveling around the world allegedly to obtain material for his manuscript was an "activity * * * not engaged in for profit" within the meaning of section 183(a) of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Maurice C. Dreicer, is a United States citizen who maintained his residence in the Canary Islands, Spain, when he *135 filed his petitioner herein. He filed his individual Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center, Holtsville, N.Y.
The petitioner has had a diversified career and has pursued many endeavors over the years. He began his career in radio in 1938, when he was engaged in the origination and sale of radio programs. He created such radio programs as "Where Are You From," "The Speech Master," "Verbal Dynamics," and "The Quincy Howe Show." The petitioner acted as the host of some of these programs, and he was also a pioneer in the television industry. In the 1950s, the petitioner decided to focus his activities on writing and consulting on tourism and dining. To promote his activities, he originated the Dreicer Awards, an award he gave to restaurants and chefs of special merit. He did not receive any compensation from the recipients of the awards; he felt that the recipients' publicizing the award was sufficient compensation for him. In 1955, the petitioner's book, The Diner's Companion, was published by Crown Publisher's Inc. (Crown). The book contained the petitioner's opinions of various restaurants throughout the world, as well as general *136 advice on dining. However, The Diner's Companion was not a commercial success, and in 1963, Crown lowered its original price in an attempt to sell the remaining books. The petitioner then purchased the remaining books from Crown, and since that time, he has sold about 50 to 100 copies of his book each year by his own efforts. The petitioner's total royalties from Crown for sales of The Diner's Companion was approximately $643, based on 1,645 sales of the book. During the late 1950s and continuing into the 1960s, the petitioner procured promotional arrangements with various businesses in order to obtain more publicity for his endeavors. He was designated a consultant to Buitoni Macaroni Corporation, the Arthur Guinness & Sons Company, Carling-Jenkler Company, and Western Hills Hotel. During this period, he also wrote a column for Travel Agent magazine and lectured at various travel organizations. In 1961, he made a commercial for Quilmes Brewery in Argentina. There is no evidence that he received cash compensation from any of these activities; he felt sufficiently compensated by the publicity that he may have secured from them. He also continued to develop ideas for radio and *137 television programs, although on a much-reduced level than in earlier years. During the 1970s, the petitioner was designated a consultant on food products for the Charles Brady Associates Establishment, a firm which provides commercial distribution of products to military commissaries, exchanges, and clubs. He was occasionally paid for the promotional services he provided for such firm. The petitioner also continued to write articles on tourism and dining. In 1972, he wrote an article about Marbella, Spain, which was published there in a local newspaper; but he received no compensation for the article. Then in 1973, he wrote an article that appeared in The Canary Islands Sun ad an article about Florida restaurants that appeared in The Blade, Toledo, Ohio. The petitioner received $35 for the article in the Toledo newspaper. During the years in issue, he also continued to revise old and develop new ideas for radio and television programs; but the petitioner has not sold any of such ideas since 1955. The petitioner first conceived the idea of "searching for the perfect steak" as the topic for a book sometime in the mid-1950s, about the time he decided to write The Diner's Companion. *138 He intended his second book to be a general compilation of the information, impressions, and reminiscences he accumulated over his lifetime. The petitioner hoped the book would have popular appeal, and he received encouragement in this endeavor from his friends and acquaintances, some of whom were writers and restaurateurs. The petitioner traveled around the world gathering material for his second book, and he stayed in some of the finest hotels and dined in the finest restaurants purportedly to determine if such establishments should be mentioned in his book. In the course of gathering material for his book during the years in issue, the petitioner visited London four times, Paris three times, Marbella three times, Miami twice, Los Angeles twice, San Francisco twice, as well as numerous other places in the Orient, United States, and Europe. Both the petitioner and his fulltime secretary who traveled with him flew coach and often used a Eurail pass in an effort to curtail their expenses. In the early 1970s, the petitioner commenced actually writing his second book which he tentatively entitled "My 27 Year Search for the Perfect Steak -- Still Looking" (Perfect Steak). He worked *139 on the manuscript about 3 months a year while he stayed at his residence in the Canary Islands, and he traveled for the remainder of the year. In the mid-1970s, the petitioner prepared what he considered his completed draft of the manuscript, but some portions of it were still in outline form. The manuscript contained 12 percent of the material the petitioner had previously used in The Diner's Companion. He submitted the work to Doubleday & Co., Inc. (Doubleday), for publication; however, it did not accept his manuscript. He then sent the piece to Scott Meredith Literary Agency (Scott Meredith), which also rejected it. The petitioner sent his manuscript to no other publishers. The petitioner was assisted in his activities during the 1960s and 1970s by his secretary, Brigitte Kimmich. She kept a record of the petitioner's daily expenses, took stenography, and typed his articles, business correspondence, and his manuscript. When the petitioner was gathering information on the restaurants and areas he visited, he dictated his impressions to Ms. Kimmich, who later transcribed them. Ms. Kimmich speaks English, French, and German and has a knowledge of Spanish; she served as the *140 petitioner's interpreter when he inter-viewed people in foreign countries, and she often assisted him in grading restaurants. She also acted as his driver whenever he needed to rent a car, since he does not drive. Ms. Kimmich worked fulltime for the petitioner, and she was on call all day. The petitioner paid her $100 per week for her services, and he paid for all her traveling expenses as well. In the course of his activities over the years, the petitioner continued to seek publicity for himself as a knowledgeable gourmet. He has received keys to the cities of San Francisco, Las Vegas, and New Orleans; he received a plaque from the mayor of Munich, a metal scroll from the mayor of Anchorage, Alaska, and a cup from the Swiss National Tourist office. During the years in issue, he appeared on radio and television talk shows, and he obtained interviews with newspaper correspondents, who subsequently wrote articles about his activities and his opinions on dining and tourism. Ms. Kimmich assisted the petitioner in this regard by typing his correspondence and helping him prepare for the interviews. The petitioner kept a record of the places he visited and the expenses he incurred *141 during the years in issue. He dictated such information to Ms. Kimmich, who transcribed it onto index cards soon after the expenditure was made. The information recorded on such cards included the date, the city the petitioner was visiting, the name of the hotel or restaurant he visited, the reasons he visited the particular establishment, the expenses he incurred, and whether any of such expenses were personal.He also kept a daily diary which contained more detailed information. Ms. Kimmich assisted him with the diary as well. The petitioner devoted all his time to his travels, and he was not otherwise employed during the years in issue. However, the petitioner had income, independent of his writing and lecturing activities, from a family trust of which he is the beneficiary, dividends, interest, and capital gains in the total amounts of $130,647.14 for 1972 and $91,803.49 for 1973. The following table is a summary of the revenue, expenses, and losses generated by the petitioner's activities as a writer and lecturer during the years 1967 through 1976 as listed on schedule C of his income tax returns: Year
Revenue
Expenses
Loss
1967
$ 2,130.00
$ 28,044.00
$ 25,914.00
1968
1,639.00
24,546.00
22,907.00
1969
3,104.68
27,612.23
24,507.55
1970
1,443.10
27,837.97
26,394.87
1971
1 ,962.00
22,558.00
20,596.00
1972
1,317.80
23,113.56
21,795.76
1973
1,565.00
29,587.05
28,022.05
1974
1,558.00
32,421.37
30,863.37
1975
520.50
32,056.70
31,536.20
1976
526.00
26,599.05
26,073.05
Total
$15,766.08
$274,375.93
$258,609.85
*142 The petitioner has admitted that the expenses of his activities have exceeded, on the average, $25,000 each year since 1956. On his Federal income tax returns, the petitioner deducted losses of $21,795.76 in 1972 and $28,022.05 in 1973, arising from his activities as a writer and lecturer. In his notice of deficiency, the Commissioner disallowed such losses because he concluded that the petitioner's activities were not engaged in for profit. OPINION The only issue to be decided is whether the petitioner's activity of traveling around the world allegedly to obtain material for his manuscript the Perfect Steak was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed. Sec. 1.183-1(b)(1), Income Tax Regs.Section 183(b)(2) provides that deductions *143 which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows: (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Section 183(d) provides that, if for any 2 of 5 consecutive taxable years, the gross income derived from an activity exceeds the deductions, the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. Because the petitioner's activity has produced a loss for the 10 years ending with 1976, such presumption is not in effect in this case. The test for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162 is whether the individual's primary purpose and intention *144 in engaging in the activity is to make a profit. Golanty v. Commissioner, 72 T.C. 411, 425 (June 5, 1979), on appeal (9th Cir., Aug. 31, 1979); Allen v. Commissioner, 72 T.C. 28 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978); Churchman v. Commissioner,68 T.C. 696, 701 (1977); Jasionowski v. Commissioner, 66 T.C. 312, 319 (1976); Benz v. Commissioner, 63 T.C. 375, 383 (1974). The taxpayer's expectation of profit need not be a reasonable one; it is sufficient if the taxpayer has a bona fide expectation of realizing a profit, regardless of the reasonableness of such expectation. Sec. 1.183-2(a), Income Tax Regs.; Mercer v. Commissioner, 376 F. 2d 708, 710-711 (9th Cir. 1967), revg. a Memorandum Opinion of this Court; Dunn v. Commissioner, supra at 720; Churchman v. Commissioner, supra at 701; Benz v. Commissioner, supra at 383; Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). The issue *145 of whether a taxpayer engages in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances of the case (sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner, supra at 426; Allen v. Commissioner, supra at 34; Dunn v. Commissioner, supra at 720; Jasionowski v. Commissioner, supra at 319; Benz v. Commissioner, supra at 382), and the burden of proving the requisite intention is on the petitioner ( Boyer v. Commissioner, 69 T.C. 521, 537 (1977), on appeal (7th Cir., July 7, 1978); Benz v. Commissioner, supra at 382; Johnson v. Commissioner,59 T.C. 791, 813 (1973), affd. 495 F. 2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974); Sabelis v. Commissioner, 37 T.C. 1058, 1062 (1962)). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. *146 Boyer v. Commissioner, supra at 537; Benz v. Commissioner, supra at 382-383. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise iof the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is eared; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Although no one factor is determinative of the taxpayer's intention to make a profit (sec. 1.183-2(b), Income Tax Regs.), a record of substantial losses over many years and the unlikelihood of realizing a profit from the endeavor are important factors bearing on the taxpayer's true intention. Sec. 1.183-2(b)(6), Income Tax Regs.; Jasionowski v. Commissioner, 66 T.C. at 322; Bessenyey v. Commissioner, 45 T.C. at 274; *147 V. H. Monette & Co. v. Commissioner, 45 T.C. 15, 47 (1965), affd. per curiam sub nom. Monette v. Commissioner, 374 F. 2d 116 (4th Cir. 1967). As this Court stated in Bessenyey v. Commissioner, supra at 274: the presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. The petitioner has characterized himself as a multimedia personality whose activities consisted not only of writing books and articles on tourism and dining, but also of originating television and radio shows, giving paid endorsements on behalf of food products and dining establishments, and serving as consultant to restaurants, hotels, and food distributors. Although the petitioner may have held such positions and successfully pursued some of such endeavors many years ago, the record in this case shows beyond a doubt *148 that there was no possibility of the petitioner realizing sufficient profit from his writing and lecturing activities to recoup the very large losses sustained in the preceding years, and terefore, we are convinced that, during the years in issue, the petitioner could not have had a bona fide expectation of realizing a profit from such activities. Bessenyey v. Commissioner, supra at 274. As a first matter, it is necessary to examine the various activities in which the petitioner claims to have been engaged during the years at issue and to decide which of those are to be considered in applying the tests of section 183. He claims to be a writer-lecturer on dining and tourism. In connection with this phase of his activities, he has traveled extensively, and he has stayed in some of the world's finest hotels and dined in its finest restaurants.He contends that such activity was part of his research for his manuscript the Perfect Steak. However, he also characterizes himself as a television and radio program originator. Section 1.183-1(d)(1), Income Tax Regs., provides in part: In order to determine whether, and to what extent, section 183 and the regulations *149 thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts ad circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. * * * The Commissioner contends that the petitioner's activity as a writer-lecturer *150 is separate and distinct from his activity as an originator of radio and television programs. We agree with the Commissioner's characterization of the petitioner's endeavors. The petitioner incurred the expenses during the years in issue as he traveled around the world to gather material for a book about "the perfect steak." As we understand the petitioner's position, he expected to use the information which he acquired on such travels, not only for the preparation of a book, but also to prepare for lectures, on radio and television appearances, and other public appearances. It is not clear as to whether the petitioner claims that he also was working on the origination and creation of shows not related to his traveling, but any such activity produced no income during the years at issue and would be wholly unrelated to his writing and lecturing on travel and dining. Accordingly, we consider only his activities relating to writing and lecturing on dining and traveling as the "activity" to be tested under section 183. In this record, we have information concerning the petitioner's activities for a period of 10 years--1967 through 1976, and in each of those years, the petitioner incurred *151 a substantial loss as a result of his activities allegedly to obtain information for his writing and lecturing. For the 10 years, the petitioner's losses totaled $258,609.85. A record of such large losses over so many years is persuasive evidence that the petitioner did not expect to make a profit. Sec. 1.183-2(b)(6), Income Tax Regs.; Wiles v. United States,312 F. 2d 574, 576 (10th Cir. 1962). The petitioner contends that, desipite such losses, he expected to eventually make a great deal of money and establish a "national name" for himself. The desire to make money is not tantamount to a bona fide expectation of realizing a profit. One may intensely desire to make money and have one's endeavors be profitable, and at the same time, not have a bona fide expectation of profit because past unprofitability has been overwhelming. Section 1.183-2(b)(7), Income Tax Regs., provides that the "opportunity to earn a substantial ultimate profit in a highly speculative venture" is indicative of a profit motive, but here there is no prospect of realizing a profit. The petitioner admitted that his expenses exceeded $25,000 each year since 1956. Thus, over a 20-year period, *152 such expenses exceeded $500,000. The petitioner's own expert witness, a literary agent who had been in the publishing business 19 years as of the time of trial, testified that the maximum amount the petitioner could expect to receive as royalties from a successful book was $250,000. Consequently, even though the petitioner might receive some additional income from lecturing and endorsements, there is absolutely no prospect that his income from the activity of writing and lecturing could exceed the $500,000 expended. Bessenyey v. Commissioner,45 T.C. at 274. Section 1.183-2(b)(8), Income Tax Regs., states that whether the taxpayer has other income and whether he has an independent means of support are factors to be considered in determining the profit motive of the taxpayer. See Bessenyey v. Commissioner,45 T.C. at 275. The petitioner's income independent of his writing and lecturing was $130,647.14 in 1972 and $91,803.49 in 1973. [2] In addition, over the years, the petitioner's income from dividends, interest, capital gains, and a family trust was substantial and was sufficient to enable him to pursue his writing and lecturing activity, notwithstanding *153 the expenses he incurred in such activity. The petitioner suggests that the losses from his writing and lecturing activity were so severe that he would not have sustained such losses were it not for an expectation of making a profit from the activity. However, section 1.183-2(b)(8) provides in part: Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. [Emphasis added.] Thus, in judging the true effect of the losses on the petitioner's income, we must consider the tax benefit he expected to receive from the deduction of such losses. See Golanty v. Commissioner,supra at 428-429. If the petitioner is allowed to deduct the losses, *154 they would produce a substantial tax benefit for a person with his income from other sources, and the after-tax consequence of the losses would be considerably mitigated. Although the petitioner's writing and lecturing activity had some of "the trappings of a business" ( Bessenyey v. Commissioner,45 T.C. at 274), such "trappings" are insufficient to demonstrate that his activity was a business carried on for profit. The petitioner kept a record of his expenditures on index cards and maintained a diary of the places he toured. The records of his travels and expenses were kept systematically and were through, but the keeping of such tax records is not sufficient to establish that he kept businesslike records of the entire activity. Cf. Golanty v. Commissioner,supra at 430 (records kept by the taxpayer of the bloodlines and pedigree of her Arabian horses did not establish a profit motive or businesslike manner). He prepared a questionnaire to be used in evaluating the establishments he visited, but he failed to show that such questionnaires were routinely filled out and kept with regard to the establishments visited by him. In general, *155 he failed to show that he kept comprehensive records of his investigations of restaurants, hotels, or other matters of interest to tourists. In cases of this kind, the keeping of books and records is more important when such records are used for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the activity in question. See Golanty v. Commissioner,supra at 430. He kept no such records. Moreover, a careful examination of the petitioner's activities belies his claim that he acted in a businesslike manner. He contends that his profit motive and business intentions are demonstrated by his constant efforts to economize when he traveled. Yet, we observe that in the course of his "research" during the years in issue, the petitioner often visited the same city numerous times. For example, he visited London four times, and Paris and Marbella three times. We also observe that he returned to such places after relatively short intervals. It appears that if he were concerned about keeping his expenses to a minimum, he could have curtailed some of such trips. The petitioner contends that he visited these cities as often *156 as he did to keep his research up to date. However, his information often became dated because of such constant travel. The petitioner would purportedly research a city, and then proceed to travel so much without utilizing whatever information he had gathered that the information naturally became obsolete before he incorporated it into his manuscript. Furthermore, his statements on the index cards on which he recorded his travel information reveal that his travels during the years in issue were not directed, as he contends, toward producing a book about the quest for a perfect steak. Such statements indicate his intention to write books and articles on numerous topics, and they demonstrate that his travels were more undirected wanderings with little thought given to any real purpose. We also consider that the petitioner never pursued having his manuscript, the Perfect Steak, published after its initial rejection by Doubleday and Scott Meredity. Although some of the manuscript was still in outline form, the petitioner maintained he completed the manuscript in the mid-1970s. Yet, he introduced no record of any later attempts he made to secure its publication during the period preceding *157 the time of the trial in this case. If the petitioner had genuinely believed that the manuscript was suitable for publication, it appears that he would have made additional efforts to have it published. Surely, a writer who believes that he has a worthwhile book does not give up when he receives only two negative responses. Therefore, we cannot accept his contention that he had a bona fide expectation of realizing a profit from his manuscript. We are also not persuaded that the petitioner possessed any particular expertise on the subjects of dining and tourism. He contends that his earlier book, The Diner's Companion, received critical acclaim. Yet, he introduced no evidence of such reviews (cf. Churchman v. Commissioner,68 T.C. at 702), and it certainly was not a commercial success. Moreover, the fact that the petitioner may have been a success in radio in the 1940s, that he received the keys to various cities, and that he gave awards to various establishments do not indicate his expertise in the area, nor his ability to write a successful book on travel. Similarly, the petitioner's profit motive is not established by his arrangements with various food establishments *158 and by his appearances on local television and radio shows. Such arrangements and appearances produced no profit for the petitioner, and they may have been nothing more than an attempt to keep his name before the public as a "personality" who was once prominent in the radio industry. His profit motive is also not established by the encouragement he may have received in his endeavors by some of his friends who were restaurateurs and writers. It is not unusual that friends, some of whom the petitioner admitted he knew for well over 30 years, should extend kind and encouraging words regarding his latest project. Although the petitioner spent a fair amount of time traveling around the world in his endeavors, we are not convinced that such activity is anything more than his lifestyle, a lifestyle to be envied by those who do not have independent income to sustain it. The petitioner contends, however, that he gets little personal enjoyment from "living out of a suitcase." Yet, the record establishes that he incurred substantial expenses in such endeavors since 1956--over a 20-year period. It appears that if the petitioner were so averse to this style of living, then he would have *159 completed his "research" long ago and have moved on to other pursuits.
The regulations also include the success of the taxpayer in carrying on other similar or dissimilar activities as a factor to be considered in determining a bona fide profit motive. Sec. 1.183-2(b)(5), Income Tax Regs. Although the petitioner claims to be a writer, he did little writing after the publication of The Diner's Companion in 1955. He once wrote for Travel Agent magazine, but he introduced no evidence of other literary pursuits. Except for the articles in the Marbella newspaper, The Canary Islands Sun, and The Blade, he wrote nothing except the manuscript for the Perfect Steak during the years in issue. Furthermore, the petitioner's activities have the strong elements of personal pleasure which, in accordance with subparagraphs (8) and (9) of section 1.183-2(b), may indicate a lack of a bona fide profit motive. Despite the petitioner's protestations that he does not enjoy his travels, his continuing to lead the life that he has for so many years, and the amount of money he expends thereon, suggest that such activity is the quint-essential example of an activity with great elements of personal pleasure *160 to which the regulations are addressed. Lastly, the petitioner relies on the fact that he was allowed to deduct the expenses of his writing and lecturing activities in prior years. However, it is a well established principle that the settlement of issues in previous years has no precedential effect on the resolution of issues presently before the Court.See Tollefsen v. Commissioner,52 T.C. 671, 681 (1969), affd. 431 F. 2d 511 (2d Cir. 1970), cert. denied 401 U.S. 908 (1971); Fitzner v. Commissioner,31 T.C. 1252 (1959); Babbitt v. Commissioner,23 T.C. 850, 863 (1955). In conclusion, after a careful review of all the facts and circumstances of this case, we hold that the petitioner's activity of traveling around the world allegedly to obtain material for a manuscript was an "activity * * * not engaged in for profit" within the meaning of section 183(a), since he did not have a bona fide expectation of profit. Accordingly, the losses incurred by him during 1972 and 1973 are not deductible. Due to concessions concerning other issues, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. The petitioner's independent income during the years in issue was comprised of the following amounts: ↩
1972
1973
Capital gains
$ 67,908.19
$21,437.63
Trust income
33,077.17
19,559.91
Dividends
28,258.54
32,760.40
Interest
1,403.24
18,045.55
Total
$130,647.14
$91,803.49